IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
August 2, 2005 Session

**STATE OF TENNESSEE v. HEZZIE BONDS**

**Direct Appeal from the Circuit Court for Gibson County
Nos. 16028 & 16184      Clayburn Peeples, Judge**

_____

**No. W2004-02447-CCA-R3-CD  - Filed September 22, 2005**

_____

This is a direct appeal as of right from a jury conviction of aggravated rape and criminal exposure of another to HIV. The trial court sentenced the Defendant to consecutive terms of twenty-five years and six years, for an effective sentence of thirty-one years. On appeal, the Defendant raises only one issue: there is insufficient evidence to find him guilty of the two offenses for which he was convicted. We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which NORMA MCGEE OGLE and J.C. MCLIN, JJ., joined.

Paul B. Conley, III, Humboldt, Tennessee, for the appellant, Hezzie Bonds.

Paul G. Summers, Attorney General & Reporter; David H. Findley, Assistant Attorney General; and Garry Brown, District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

The Defendant was indicted by a Gibson County grand jury on one count of aggravated rape of a thirteen-year-old male.[1] After it was learned that the Defendant was HIV positive, he was also indicted by a Gibson County grand jury on one count of criminal exposure of another to HIV.[2] The two cases were consolidated, and the Defendant's first trial on these charges resulted in a hung jury. The Defendant was retried, and a jury found him guilty as charged. This appeal followed.

_____

[1] See Tenn. Code Ann. § 39-13-502.

[2] See Tenn. Code Ann. § 39-13-109.

At the second trial, the victim, M.S.,[3] testified that at the time of the incident he was thirteen years old, weighed about one hundred five pounds, and was approximately five feet and two inches tall. Although he had since moved, at the time of the incident he lived in Milan with his mother. On the day in question, he attended school and then afterwards visited the home of his best friend, Brian Bradford, where the two "play[ed] games and stuff" for a period of time. At some point, the two boys decided to walk to the Defendant's house to get some cigarettes. M.S. stated that the two remained at the Defendant's house for approximately ten minutes, got the cigarettes, and left. Both boys returned to Brian's house where they continued to play video games and smoked the cigarettes. M.S. further testified that he "knew of" the Defendant because several months earlier the two boys and the Defendant had gone fishing together. The Defendant's house was described as "around the corner" and only a "five to seven minute walk" from Brian Bradford's house.

At some point that same afternoon, M.S. decided to go back to the Defendant's house alone to get more cigarettes. M.S. testified that he thought he may have told Brian where he was going but was unsure. M.S. testified that when he arrived at the Defendant's house, there was "another man" there, sitting on the couch. M.S. described this man as "a large black male" who was about six feet four inches tall and weighed between three hundred and three hundred fifty pounds. The Defendant gave M.S. two more cigarettes, which he put in the front pocket of his jeans. As he attempted to leave, the large man stopped him. M.S. described what happened next as follows:

> [H]e got up and grabbed me and he was a lot larger than I was so, I mean, he just threw me on the ground and he laid across my back across my shoulders and held my arms down and then Mr. Bonds pulled my pants down and he stuck his penis in my anus. . . . I kicked. I punched. I done everything. Screamed. There wasn't much I really could do, 'cause I was so small and there was two of them and one of me.

M.S. testified that after the Defendant raped him, the Defendant also threatened to kill him if he told anyone what had happened. M.S. was then allowed to leave. M.S. stated that he pulled his underwear and pants up and started to walk back to Brian's house. Because he felt "nasty and dirty," he did not want anyone to see him, so he took a longer, more secluded route to Brian's house. He walked slowly through a forested area and cried. It took him about ten to twelve minutes to get to Brian's house, but upon arriving he and Brian played video games for thirty or forty-five minutes, smoked the two cigarettes, and then M.S. went home. He did not tell Brian or his mother what had happened the day of the incident. After arriving at home that evening, he ate supper, and then went to his room where he sat for several hours until he was sure everyone else was asleep. At about 3:00 a.m., he took a shower because he "felt dirty and ashamed and nasty." M.S. stated that he was not bleeding from his rectum as a result of the rape.

M.S. further testified that he did not tell anyone what had happened for some time because he was so ashamed. Two weeks after the incident, M.S. finally told Brian, who convinced him he should tell an adult. The two boys informed their school principal, who called the police. M.S.

---

[3] It is the practice of this Court to identify juvenile victims of sexual offenses by their initials only.

stated that he believed his mother first learned of the rape through the police. M.S. testified that since the incident, he has undergone years of out-patient counseling and spent a brief period of time in a medical facility for in-patient counseling. He has been tested for HIV eight times, each time testing negative.

On cross-examination, M.S. testified that the large man who held him down never spoke, but that he bit this man on the hand. He also stated that Brian never asked him if he had been crying when he returned with the cigarettes. Additionally, M.S. admitted that despite the violent nature of the attack, the cigarettes, which were in the front pocket of his jeans, were not significantly damaged. M.S. further testified that while he identified a large black man from a photo lineup shortly after the incident, when he saw the man in person he "was not sure."[4]

Brian Bradford testified that he was a friend of the victim, and had been with him on the date at issue. Mr. Bradford stated that he did not remember if M.S. specifically told him that he was going back to the Defendant's house for more cigarettes, but that it was not unusual for him to come and go as he pleased. He did remember M.S. leaving that day and returning a short time later. Mr. Bradford testified that when M.S. returned he was "acting quiet," and "walked funny." However, Mr. Bradford did not question M.S. about this at the time. He did, however, remember this unusual behavior because M.S. "usually talked" when they were together.

Mr. Bradford stated that it was some time later when M.S. finally told him that a large man held him down while the Defendant raped him. He convinced M.S. to go and tell their high school principal. On cross-examination, Mr. Bradford admitted that when M.S. returned to his house after the incident he did not look like he had been crying or sweating.

The prior testimony of Carol Jones, a children and youth therapist, was introduced.[5] Ms. Jones stated that she had seen the victim on a professional basis one or two times a month for a year and sporadically after that. She testified that while the victim talked of the rape, she never pressed him for details. She further testified that the victim never gave her any reason to believe he was being deceptive about the incident.

Jane Vernon, a registered nurse, testified at trial that the Defendant's medical records reveal that he is HIV positive. Ms. Vernon testified further that these records also reveal that the Defendant was informed of this fact as early as 1994, and was given several "HIV clinics" in which he was educated about the disease and given counseling on how it would effect his life and those around him. Ms. Vernon also stated that an HIV positive person may not always infect another person via

---

[4] The record reveals that an unidentified man was arrested in connection with this incident based on the victim's identification of him from a photographic array. However, further investigation revealed that this man was at another location at the time of the incident, and the victim also stated that he was "not sure" it was the right man after seeing him in person. This man was released, and no other suspect was located.

[5] Ms. Jones was unable to attend the March 2004 trial, but had previously testified about the issue at a prior proceeding. Ms. Jones' testimony was read into the record at trial.

sexual intercourse. She explained that many factors are involved, the most significant of which is the strength of the non-infected person's immune system. Other factors include the amount of semen or bodily fluids transferred, and blood exposure.

The defense called only one witness, Investigator Jerry Harsfield. Officer Harsfield testified that he was assigned to investigate the case after the rape was reported. He first talked to the victim on January 4, 2001, slightly over a month after the rape. He had the victim's mother take him to a doctor for an examination. Officer Harsfield stated that the victim described the man that assisted the Defendant in the rape as a "big, stocky guy," but did not report that he had bit him on the hand. Officer Harsfield showed the victim some photos, and the victim identified one suspect, who Officer Harsfield arrested. However, further investigation revealed that this suspect had a strong alibi which would have precluded his involvement in the rape of the victim.

At the conclusion of the trial, the Defendant was found guilty of aggravated rape, a Class A felony, and criminal exposure of another to HIV, a Class C felony. The Defendant was subsequently sentenced as a violent offender to twenty-five years for his aggravated rape conviction, and received a consecutive sentence of six years as a Range I, standard offender for his conviction for criminal exposure to another of HIV.

The Defendant timely filed a motion for a new trial, alleging insufficient evidence. The motion was denied by the trial court, and this appeal followed.

**ANALYSIS**
**I. Standard of Review**

The Defendant argues on appeal that there was insufficient evidence presented at trial for any rational trier of fact to find beyond a reasonable doubt that he was guilty of the two crimes for which he was convicted. In support of this assertion, the Defendant raises two basic arguments: 1) the victim's testimony, upon which the entire case against him rested, was not credible, and there was no physical evidence to corroborate this testimony; and 2) the State failed to provide evidence to support the "exposure of bodily fluid" element of the criminal exposure offense. We disagree.

Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." A convicted criminal defendant who challenges the sufficiency of the evidence on appeal bears the burden of demonstrating why the evidence is insufficient to support the verdict, because a verdict of guilt destroys the presumption of innocence and imposes a presumption of guilt. See State v. Evans, 108 S.W.3d 231, 237 (Tenn. 2003); State v. Carruthers, 35 S.W.3d 516, 557-58 (Tenn. 2000); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). This Court must reject a convicted criminal defendant's challenge to the sufficiency of the evidence if, after considering the evidence in a light most favorable to the prosecution, we determine that any rational trier of fact could have found the essential elements of

-4-

the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Hall, 8 S.W.3d 593, 599 (Tenn. 1999).

On appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable and legitimate inferences which may be drawn therefrom. See Carruthers, 35 S.W.3d at 558; Hall, 8 S.W.3d at 599. A guilty verdict by the trier of fact accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). Questions about the credibility of witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate the evidence. See Evans, 108 S.W.3d at 236; Bland, 958 S.W.2d at 659. Nor will this Court substitute its own inferences drawn from circumstantial evidence for those drawn by the trier of fact. See Evans, 108 S.W.3d at 236-37; Carruthers, 35 S.W.3d at 557.

## II. Aggravated Rape

The Defendant was convicted of one count of aggravated rape. Aggravated rape is, in relevant part, the "unlawful sexual penetration of a victim by the defendant or the defendant by a victim accompanied by . . . the following circumstances: (3) The defendant is aided or abetted by one (1) or more other persons; and (A) Force or coercion is used to accomplish the act." Tenn. Code Ann. § 39-13-502(a)(3)(A).

The Defendant does not argue that if the State's evidence is accepted as true the proof fails as a matter of law to establish all the elements necessary for aggravated rape. Rather, the Defendant argues that the State's only eyewitness testimony, that of the victim, is not credible, and furthermore, there is no physical evidence to corroborate the victim's testimony. Thus, the Defendant asserts, there is insufficient evidence to find him guilty beyond a reasonable doubt. To support his argument the Defendant first notes that while the victim claimed two men were involved in the rape, he was only able to identify one. Moreover, the victim initially misidentified the second man, and despite police investigations, the six-foot four inch, three hundred to three hundred fifty pound black man was never found. The Defendant submits that such a man, should he actually exist, would be hard to miss. The Defendant also asserts that the victim's version of the event lacks credibility because while the victim states he was thrown to the ground and his pants were pulled down in a violent attack, the two cigarettes in his front pants pocket were not broken.

Additionally, the Defendant points to the complete dearth of physical evidence of the type that would normally corroborate a claim of aggravated rape. The Defendant emphasizes the fact that there was no medical report presented at trial to support a claim of rape. Furthermore, the victim's own testimony as well as that of Mr. Bradford revealed that the victim suffered no physical injuries despite the victim's version of the violent nature of the attack. Based on these arguments, the Defendant asserts that the State failed to provide sufficient evidence to prove he was guilty of aggravated rape.

The Defendant's first argument, questioning the plausibility of the victim's testimony, amounts to nothing more than a challenge to the jury's determination of the credibility of the witnesses. However, as already stated, a jury's guilty verdict accredits the testimony of the State's witnesses and resolves all conflicts in the evidence in favor of the prosecution's theory. See Bland, 958 S.W.2d at 659. Moreover, questions about the credibility of a witness and the weight and value of the evidence presented at trial are issues that are resolved by the trier of fact, and this Court will not re-weigh or re-evaluate this evidence. See Evans, 108 S.W.3d at 236. In this case, the jury obviously accredited the testimony of the victim as to the events of the crime. Thus, the Defendant's argument that the State failed to provide sufficient evidence to convict him of aggravated rape because the victim's testimony was of questionable credibility is misplaced.

The Defendant also argues that the State failed to provide sufficient evidence to convict him of aggravated rape because there was no physical evidence to corroborate the victim's testimony. However, this argument also fails. It is well-settled law in Tennessee that "the testimony of a victim, by itself, is sufficient to support a conviction." State v. Strickland, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); State v. Williams, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981). In short, corroboration of a victim's testimony by physical evidence is not required for a jury conviction to be upheld on appeal. In this case, the victim's testimony established that the Defendant unlawfully sexually penetrated the victim when the Defendant "stuck his penis in [the victim's] anus," and this act was accomplished by means of force and with the aid of another person. Accordingly, we conclude there was sufficient evidence presented at trial for a rational trier of fact to find that the Defendant committed the offense of aggravated rape beyond a reasonable doubt.

## III. Criminal Exposure of Another to HIV

The Defendant was also convicted of exposing another to HIV. Since 1994 it has been a criminal offense in Tennessee for any person with knowledge that he or she is infected with human immunodeficiency virus (HIV) to "[k]nowingly [e]ngage[] in intimate contact with another." Tenn. Code Ann. § 39-13-109(a)(1). The statute further defines "intimate contact with another" as "the exposure of the body of one person to a bodily fluid of another person in any manner that presents a significant risk of HIV transmission." Id. at 39-13-109(b)(2).[6]

### A. Witness Credibility and Lack of Physical Evidence

The Defendant raises the same arguments pertaining to his conviction for criminal exposure of another to HIV that he raised in challenging his aggravated rape conviction, but also adds the argument that because the victim has been diagnosed as free from HIV, this piece of physical evidence also weighs against the Defendant's testimony. As to the first arguments, we find they fail for the same reasons outlined above. As to the suggestion that the victim's HIV negative status weighs against a conviction for criminal exposure, we note that the testimony at trial from the registered nurse was that not every sexual encounter with someone infected with HIV will transmit

---

[6] We note that it is an affirmative defense to prosecution that the person exposed to HIV knew that the Defendant was infected with HIV, knew that the action could result in infection with HIV, and consented to the action with that knowledge. See Tenn. Code Ann. § 39-13-109(c).

the virus. Additionally, the criminal exposure statute itself states that "[n]othing in this section shall be construed to require the actual transmission of HIV in order for a person to have committed the offense of criminal exposure of another to HIV." Tenn. Code Ann. § 39-13-109(d).

The evidence that supports the aggravated rape conviction is largely the same evidence the jury relied upon to find the Defendant guilty of criminal exposure to another of HIV. As stated above, this Court will not re-evaluate the credibility of witness testimony, nor will we re-weigh the evidence presented at trial upon which a jury has based a verdict of guilt. Accordingly, the Defendant's argument that questionable witness testimony and lack of corroborating physical evidence resulted in insufficient evidence upon which to base a conviction for criminal exposure of another to HIV is also misplaced.

    B. Interpretation of Criminal Exposure Statute
    The Defendant also asserts that there was insufficient evidence as a matter of law to convict him of criminal exposure of another because the State failed to meet the "exposure of bodily fluid" element. It is the Defendant's position that, pursuant to the statutory definition of "intimate contact with another," the criminal offense of exposure of HIV to another "requires the exposure of 'bodily fluid' of the infected person to the body of another." On this point, the Defendant argues that "[a] close review of the testimony shows that there was no evidence introduced that any 'bodily fluid' (i.e. semen) of Mr. Bonds was found on the victims [sic] body." The State argues that the statute at issue does not require proof of actual transfer of a bodily fluid as the Defendant asserts, but rather the plain meaning of "exposure" requires only that the Defendant put the victim at risk of coming into contact with bodily fluids. The State further argues that unprotected sexual penetration of the victim's anus qualifies as "exposure" to bodily fluids.

    This issue is essentially a matter of statutory interpretation. We begin by noting that when examining a purely legal issue, such as statutory construction, Tennessee appellate courts adhere to a de novo standard with no presumption of correctness as to the lower court's conclusions of law. See State v. Owens, 20 S.W.3d 634, 637 (Tenn. 2000); State v. Alford, 970 S.W.2d 944, 945 (Tenn. 1998) ("Construction of a statute is a question of law which we review de novo, with no presumption of correctness").

    The Tennessee Supreme Court has ruled that "[t]he most basic principle of statutory construction is to ascertain and give effect to the legislative intent without unduly restricting or expanding a statute's coverage beyond its intended scope." Owens v. State, 908 S.W.2d 923, 926 (Tenn. 1995). See also Browder v. Morris, 975 S.W.2d 308, 311 (Tenn. 1998) ("The cardinal rule of statutory construction is to effectuate the legislative intent, with all rules of construction being aides to that end."). With this in mind, the first step in determining legislative intent is to determine whether the statutory language itself is ambiguous. If it is not, we are limited to the plain meaning of the statutory language. We are instructed by our highest court to "initially look to the language of the statute itself in determining the intent of the legislature. Courts are restricted to the natural and ordinary meaning of the language used by the legislature in the statute, unless an ambiguity requires resort elsewhere to ascertain legislative intent." Id., 975 S.W.2d at 311 (citing Austin v.

Memphis Pub. Co., 655 S.W.2d 146, 148 (Tenn. 1983)). Additionally, appellate courts must "assume that the legislature used each word in the statute purposely, and that the use of these words conveys some intent and has a meaning and purpose." Id., (citing Locust v. State, 912 S.W.2d 716, 718 (Tenn. App. 1995)). Thus, "[w]here the words of the statute are clear and plain and fully express the legislature's intent, there is no room to resort to auxiliary rules of construction, and we need only enforce that statute as written." Id., (citing Roberson v. University of Tennessee, 912 S.W.2d 746, 747 (Tenn. App. 1995) and In re Conservatorship of Clayton, 914 S.W.2d 84, 90 (Tenn. App. 1995)).

While the elements of the criminal offense of exposure of another to HIV via intimate contact are outlined in part (a) of the statute, the Defendant argues that the definition section in part (b) requires the prosecution to prove the additional element of exposure to a "bodily fluid." Additionally, the Defendant interprets the phrase "the exposure of the body of one person to a bodily fluid of another person in any manner that presents a significant risk of HIV transmission," Tenn. Code Ann. § 39-13-109(b)(2), to mean the State must prove the Defendant's bodily fluid be "found on" the victim.

The Defendant's argument hinges on his interpretation of the word "exposure" in the phrase "exposure of the body of one person to a bodily fluid of another person" as used in the statute's definition of what constitutes "intimate contact with another." See Tenn. Code Ann. § 39-13-109(b)(2). The Defendant argues that this Court should interpret the word "exposure" to connote "transfer of" or "contact with" bodily fluids. However, the statutory language selected by the Tennessee legislature does not require actual contact with or transfer of bodily fluids; the statute simply requires "exposure" of bodily fluids to a victim. The commonly accepted definition of "expose" is to "make accessible to something that may prove detrimental." Webster's Third New International Dictionary 802 (1976). Moreover, Black's Law Dictionary succinctly provides the legal definition of "exposure" as "[t]he amount of liability or other risk to which a person is subject." Black's Law Dictionary (8th ed. 2004). We conclude that the use of the word "exposure" requires something less than actual contact with bodily fluids. Consequently the statute at issue requires that for a defendant to be found guilty of criminal exposure of another to HIV via intimate contact, the prosecution need only show that the defendant subjected the victim to the risk of contact with the Defendant's bodily fluids.

We thus find the Tennessee legislature's use of the word "exposure" in the statute at issue to require only evidence that a defendant subjected a victim to risk of contact with bodily fluids in a manner that would present a significant risk of HIV transmission. Furthermore, we find this language, including the word "exposure," unambiguous. In interpreting statutory text, appellate courts must "presume that the legislature says in a statute what it means and means in a statute what it says there." BellSouth Telecommunications v. Greer, 972 S.W.2d 663, 673 (Tenn. App. 1997). While the criminal code drafters could have required actual contact with or transfer of bodily fluids in the criminal exposure of another to HIV statute, they elected instead to require only "exposure" to bodily fluids. We are mindful of our supreme court's admonition that "[c]ourts are restricted to the natural and ordinary meaning of the language used by the legislature in the statute." Browder,

975 S.W.2d at 311. In this case, we conclude that when the Defendant, with knowledge that he was HIV positive, raped the victim by anal penetration, and he "exposed" the victim to bodily fluids, i.e., made his bodily fluids accessible to the victim, in a manner that presented a significant risk of HIV transmission.

We also note that contrary to the Defendant's arguments, both our existing case law construing the statute at issue, and case law on the same subject emanating from other jurisdictions, support our conclusion that "exposure" to bodily fluids requires no more than subjecting the victim to a risk of contact. We are aware of five cases pertaining to this offense that have reached this court. Four of the five have upheld convictions based only on evidence of unprotected sexual intercourse or mere sexual involvement with a victim.[7] In all four of these cases, actual contact with or physical transmission of bodily fluids was not deemed a required element.[8] See State v. Michael Danelle Harvey, No. W2001-01164-CCA-R3-CD, 2002 WL 1162346, at *1 (Tenn. Crim. App., Jackson, May 31, 2002) (upholding a conviction based upon "unprotected sex"); State v. Martin Charles Jones, No. E1999-01296-CCA-R3-CD, 2001 WL 30198, at *1 (Tenn. Crim. App., Knoxville, Jan. 12, 2001) (upholding a guilty plea based on a defendant who was "sexually involved" with the victims); State v. Pamela Denise Wiser, No. M1999-02500-CCA-R3-CD, 2000 WL 1612363, at *2 (Tenn. Crim. App., Nashville, Oct. 30, 2000) (upholding multiple convictions for engaging in "unprotected sex"); State v. Chester Lebron Bennett, No. 03C01-9810-CR-00346, 1999 WL 544653, at *1 (Tenn. Crim. App., Knoxville, July 28, 1999) (upholding guilty plea based on "unprotected sexual encounters").

The Defendant asserts that our frequent mention of "unprotected" sex in these prior cases is an indication that "exchange of bodily fluids is required." However, our prior case law does not support this conclusion. Rather, the majority of the convictions were upheld without evidence of an "exchange" of bodily fluids. Indeed, our prior case law's emphasis on "unprotected" sex supports the conclusion that "exposure" means simply to submit to a risk of contact with bodily fluids, such a risk being substantially more prevalent in unprotected sex than when some form of prophylactic is utilized.

Likewise, case law from outside jurisdictions mirror the reasoning of this Court in holding that "exposure" does not require proof of actual transfer of bodily fluids or the virus itself. As noted by the State, the Louisiana Court of Appeals held that Louisiana's HIV exposure statute, which

---

[7] Our research has revealed that only six unreported appellate court opinions, all from this court, have previously addressed the criminal exposure of another to HIV statute. Of these, only five separate cases were involved (one case was again reviewed by this court after remand) and the majority of the cases involved guilty pleas challenging only sentencing, where the sufficiency of evidence and elements of the crime were not at issue. Accordingly, the Defendant's issue pertaining to the definition of "exposure" is a matter of first impression.

[8] The conviction for criminal exposure of another to HIV was upheld in the fifth case as well, but the evidence submitted at trial did include testimony of the actual transmission of bodily fluids of the defendant to the victim. See State v. Robert Morrow, No. E2000-02796-CCA-R3-CD, 2001 WL 1105371 (Tenn. Crim. App., Knoxville, Sept. 18, 2001). However, nothing in this case indicates that the transmission of bodily fluids was itself considered a required element of the offense.

required proof that a person "intentionally expose another" to the AIDS virus, did not require scientific evidence or expert testimony of actual victim contact with the virus. See La. R.S. § 14:43.5. (2003). Rather, the court found that the evidence of "sexual conduct" was itself sufficient to convict the defendant of intentional exposure to the AIDS virus. See State v. Roberts, 844 So.2d 263, 271 (La. App. 4 Cir. 2003).

We also find persuasive the reasoning of the Washington Court of Appeals, which upheld convictions for second degree assault based on Washington's criminal exposure statute. State v. Stark, 832 P.2d 109 (Wash. App. 1992). Washington's criminal exposure statute provides that a person is guilty of second degree assault if "[w]ith intent to inflict bodily harm, [the person] exposes or transmits human immunodeficiency virus . . . ." R.C.W. § 9A.36.021(1)(e) (1992).[9] In Stark, the evidence adduced at trial revealed that the defendant "withdrew his penis from the victim prior to ejaculation" in count one and "wore a condom" or "ejaculated outside of [the victim's] body" in count two, thereby not supporting a theory of actual transfer or contact. Stark, 832 P. 2d at 112. Nonetheless, the court ruled that "[s]ince Stark is undisputedly HIV positive, he necessarily exposed his sexual partners to the virus by engaging in unprotected sex." Id. at 114 (emphasis added). The Washington Court of Appeals, like this Court, finds a key distinction between "transfer" and "exposure."

In this case, the evidence shows that the Defendant knew he was infected with HIV. It is "generally known" that HIV is "spread by the transfer of bodily fluids such as blood, genital secretions, and perhaps saliva." Alan Stephens, Annotation, Transmission or Risk of Transmission of Human Immunodeficiency Virus (HIV) or Acquired Immunodeficiency Syndrome (AIDS) as Basis for Prosecution or Sentencing in Criminal or Military Discipline Case, 13 A.L.R. 5th 628 § 2 (2004). Therefore the act of anal penetration is itself sufficient evidence of "exposure of the body of one person to a bodily fluid of another person in [a] manner that presents a significant risk of HIV transmission." Tenn. Code Ann. § 39-13-109(b)(2). The risk of the transfer of bodily fluids is self evident in such an activity, and such risk is all that is required under the Tennessee statute. Accordingly, when viewed in the light most favorable to the State, we conclude that the evidence was sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the Defendant is guilty of criminal exposure of another to HIV. This issue is without merit.

**CONCLUSION**

Based on the aforementioned reasoning and authorities, the judgments of the trial court are affirmed.

_____
DAVID H. WELLES, JUDGE

---

[9]It is worthy of note that the Washington criminal exposure statute allows for either "transfer" or "exposure" of HIV. The use of the two words suggests that they are not synonymous; i.e., exposure does not itself mean transfer.