# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT JACKSON
### Assigned on Briefs December 3, 2013

## STATE OF TENNESSEE v. ROBERT BROWN, SR.

**Appeal from the Criminal Court for Shelby County**
**Nos. 11-02096, 11-02097    Chris Craft, Judge**

---

**No. W2012-02458-CCA-R3-CD  - Filed December 19, 2013**

---

A jury convicted Robert Brown, Sr. ("the Defendant") of one count of rape of a child and one count of criminal exposure to HIV.  After a sentencing hearing, the trial court ordered the Defendant to serve an effective term of twenty-five years' incarceration.  In this direct appeal, the Defendant contends that the evidence was not sufficient to support his convictions.  Upon our thorough review of the record and applicable law, we affirm the judgments of the trial court.

## Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

JEFFREY S. BIVINS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL and JOHN EVERETT WILLIAMS, JJ., joined.

Tony N. Brayton (on appeal) and Taurus Bailey (at trial), Assistant Public Defenders, Memphis, Tennessee, for the appellant, Robert Brown, Sr.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Amy Weirich, District Attorney General; and Carrie Shelton and Jennifer Nichols, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

### Factual and Procedural Background

The Defendant was charged with one count of rape of a child and one count of criminal exposure to HIV, each crime alleged to have occurred "between June 1, 2009 and September 1, 2010."  These dates were later amended by consent to "between June 1, 2009

and February 17, 2011." The alleged victim was the Defendant's granddaughter ("the victim"). At the Defendant's ensuing jury trial, the following proof was adduced:

Shunsetha Alexander, the medical records supervisor for the Shelby County Health Department ("the Health Department"), testified that the Health Department received notification that the Defendant had tested positive for HIV and that the Defendant was notified of that status, in person, on May 19, 2009.

Jewel Wade, a health investigator for the Health Department, testified that she met with the Defendant in person on May 19, 2009, and informed him that he had tested positive for HIV. She also informed him about "safe sex" practices and about the law requiring him to reveal his HIV positive status prior to having sex with anyone. She questioned him about his sexual partners, and he told her about three. The Defendant did not identify the victim as one of his partners.

Officer Errick Ervin of the Memphis Police Department testified that he responded to a call during the early morning hours of July 2, 2010, to the Defendant's home address on Pearce. There, he encountered a woman who appeared "[l]aid back" and who "slurred" her speech somewhat as she spoke with him. As a result of what she said, Officer Ervin placed the Defendant in his patrol car. The victim was also present in the household, and Officer Ervin spoke with her. He stated that she appeared to be about eight or nine years old. He testified, "I had asked her did your granddaddy play with you inappropriately down there? Did he touch you? Did he stick his thing? Did he, you know, just words like that." Officer Ervin described the victim's demeanor:

> She was very quiet. This is about three-something in the morning. And she was quiet but she was, she was up. I told her you can tell me, you know, whatever. Did he do anything? She kept saying no. So my partner asked some questions and he was saying she said no.

Officer Ervin's partner took the victim to her grandmother's house on Looney and released the Defendant.

On cross-examination, Officer Ervin identified the woman he initially spoke with at the scene as "Ms. Clear." Ms. Clear told him "that it was mighty funny that the inner door was locked and he was in there with that little girl." Officer Ervin acknowledged that, on the scene that night, he found no probable cause to arrest the Defendant. He also acknowledged that Ms. Clear had appeared inebriated.

The victim, eleven years old at the time of trial, testified that she was born on June 1, 2001. She currently was living with her aunt, the Defendant's daughter. Previously, she had lived with her grandmother on Looney. While she was living with her grandmother, she frequently visited her grandfather, the Defendant, who lived in a different residence with his wife.

The victim turned eight years old on June 1, 2009. After she turned eight years old, a male named "Noddy" "humped on" her. Both of them had their clothes on. This occurred at the Defendant's residence. The victim told the Defendant about this, and he told her "he was going to handle it." The humping did not recur. The victim thought that Noddy was the Defendant's wife's son, the Defendant's stepson.

The victim testified that, around her eighth birthday, but after the humping incident, the Defendant "molested" her. This occurred in the Defendant's house, in his room, in his bed. The victim testified that she sat on the Defendant's bed, and he told her to take off her clothes. She took off her clothes, including her panties. According to the victim, the Defendant then "raped" her. Asked to clarify what she meant, the victim stated, "He had sex with me." Asked what that meant, she replied, "I don't know." The following colloquy ensued:

Q. Well, did somebody touch a part of your body?

A. Yes.

Q. And what part of your body was touched?

A. My private part.

Q. And when you mean private part, what are you talking about?

A. My vagina.

Q. And who touched your vagina?

A. My granddaddy.

Q. And what did he touch your vagina with?

A. His private part.

Q. And do you have a name? Do you know the real name for his private is? [sic]

-3-

A. His penis.

Q. And what did he to [sic] with his penis?

A. He put it in me.

The victim testified that she did not tell anyone about this occurrence because she was "afraid" that she would "get in trouble." Also, her grandfather told her not to tell "because he didn't want to go to jail." The victim stated that this conduct continued over the next two and one-half years. It always occurred at the Defendant's house while the Defendant's wife was at work. The victim never told anyone what was happening, but she wanted to.

The victim recalled a time when she was at the Defendant's house at night and the police arrived. No one else was in the house. She had seen Monica Clear earlier that night and explained that Clear was a relative of the Defendant's. She recalled speaking with the police officers. They asked her "did he do something to" her, and she told them "no" because she "didn't want to get in trouble." She testified that her answer to the police was not true and that the Defendant "raped" her that night. This occurred in the Defendant's bed in his room.

The victim stated that, over the course of the Defendant's conduct, he sometimes asked her to face him and other times asked her to turn around and get on her knees. When she was on her knees, the Defendant would stand behind her and "[p]ut his private part in" her. On some occasions, the Defendant asked her to "put [her] mouth on his private part."

When the victim was ten years old, she went to the doctor because she had "bumps" on her "private part." She was examined and asked whether "somebody had done anything" to her. At that point, she explained what had been occurring with the Defendant. The victim denied that anyone else had ever put their "private part" in her.

Sergeant Carl Ray of the Memphis Police Department testified that he met the victim at the hospital on February 17, 2011. Sgt. Ray also spoke with the examining physician and learned that the victim had a sexually transmitted disease. After the victim was interviewed, Sgt. Ray took the Defendant into custody. Sgt. Ray advised the Defendant of his rights, and the Defendant indicated that he wanted to make a statement.

The Defendant's written statement, dated February 17, 2011, was admitted into evidence. In the statement, when asked if he had touched or "mess[ed]" with the victim, the Defendant responded,

There is different kind of touching or messing with. I brought her [the victim] over to the house between four (4) or five (5) and my wife works from seven (7pm) to seven (7am), then [the victim] told me that she was hurting down there in her private area. I told her to let me see and I looked. She lay back on the chair and I looked at her private area (vagina). I took my finger and moved her side of her private to see what was wrong with her and it was looking white like white skin or something. It looked like she had been scratching her self [sic] because there was something white down there in her private area. I told her to go in there and get a towel out of the closet and wipe herself. Then I took her home and dropped her off.

When asked if he had sex with the victim, the Defendant responded,

I don't know if I had sex with her or not back in the summer because I was drinking then. But I think I did try. She took my private and put it between her legs and was trying to roll like grown folks do. I was not trying to have no sex because I can not get hard no way because I have diabetes and high blood pressure and high cholesterol. Its been seven (7) or eight (8) years since I had sex.

Asked if he had used a condom, the Defendant replied, "I don't think so, I don't know. I was drinking then and I don't usually drink, I was just drinking back then." The Defendant acknowledged that this incident occurred at his house on Pearce. Asked how the incident got started, the Defendant stated,

When I came out the bathroom [the victim] came around the corner and she grabbed hold to my private and she pulled her dress up and come up to me. She pulled her panties down I know because it hurted [sic] me. The reason why I know it hurt because the skin on my private was broke [sic].

He explained that his "private" was out because he "was coming out the bathroom and it was hurting (private). The skin was broke [sic] and [he] was getting ready to put it back in [his] shorts. That is when she grabbed it." The Defendant stated that he told the victim "don't you be telling this stuff and don't be telling folks about me messing with you and trying to have sex with you because I'm not a child molester." The Defendant also stated that his stepdaughter Carolyn Clear had been there earlier but left. The Defendant did not recall in what month the incident occurred. He explained that, after the incident, the police took the victim home and put him in the police car.

Dr. Karen Lakin, a pediatric specialist, testified that she examined the victim on February 17, 2011. The victim had come in as a "walk-in," complaining of "burning with

urination." The victim reported "that she had been molested by an adult." Dr. Lakin performed a sexual assault exam. She determined that the victim was prepubescent. The victim "had a very extensive amount" of external lesions of the outer lips of her vaginal area. These lesions appeared to be healing and were "hypopigmented because they have lack of color." She suspected these lesions might have been the result of herpes. There were also some lesions on "a little bit more interior" location that "could have been related to genital warts." Dr. Lakin stated that both herpes and genital warts were sexually transmitted diseases. Dr. Lakin also discovered that the victim was missing some tissue in her hymen. Dr. Lakin testified that the missing tissue was "indicative of penetration or an injury." The victim also tested positive for HIV.

Dr. Lakin stated that she interviewed the victim, and the victim "disclosed to [her] that the grandfather and grandfather's son Naughty [sic] had been sexually assaulting her for the past year." She acknowledged that the victim did not use the term "sexual assaulting." The victim told her that the last sexual contact she had with her grandfather was February 16, 2011.

On cross-examination, Dr. Lakin acknowledged that the victim's grandmother, with whom the victim had been living, informed Dr. Lakin that she was also HIV positive.

The State rested its proof, and the defense put on no proof. As to the State's election of offenses, the trial court instructed the jury as follows:

> The State has offered proof in its case in chief of more than one act allegedly committed by the defendant which the State alleges constitutes an element of the offense of rape of a child as charged in Indictment 11-02096 and criminal exposure to HIV in Indictment 11-02097. To ensure a unanimous verdict the law requires the State to elect which alleged act testified to the State is relying upon for your consideration in deciding whether or not the defendant is guilty of an offense or any lesser included offense. The fact that the Court has required the State to elect does not mean that the Court has found that the State has carried its burden of proving these allegations beyond a reasonable doubt, that is for your determination.

> In both of these indictments the State has elected to submit for your consideration the alleged act of vaginal penetration of the victim by the defendant's penis, occurring between July 1 and 2, 2010, at the defendant's house on Pearce Street in Memphis, Tennessee, just prior to an officer with the Memphis Police Department being called to that location.

Members of the jury, you are to consider only this alleged act in deciding whether or not the defendant has been proven guilty beyond a reasonable doubt of the offenses charged and included in these indictments.

The jury convicted the Defendant as charged.

After a sentencing hearing, the trial court sentenced the Defendant to concurrent sentences of twenty-five years for the rape offense (to be served at one hundred percent) and six years for the exposure to HIV offense, to be served in the Tennessee Department of Correction. The trial court denied the Defendant's motion for new trial, and this appeal timely followed. The only issue the Defendant raises is the sufficiency of the evidence underlying his convictions.

## Analysis

Our standard of review regarding sufficiency of the evidence is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is removed and replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992). Consequently, the defendant has the burden on appeal of demonstrating why the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn. 1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

### *Rape of a Child*

Rape of a child is the unlawful sexual penetration of a victim who is more than three years old but less than thirteen years old. See Tenn. Code Ann. § 39-13-522(a) (2010).

Sexual penetration "means sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body . . . but emission of semen is not required." Id. § 39-13-501(7) (2010). In this case, the Defendant was convicted of having committed the unlawful sexual penetration of the victim on the night of July 1-2, 2010, when the victim was nine years old.

The Defendant argues that the proof was not sufficient to show that he sexually penetrated the victim on the night in question. As set forth above, the victim testified that, on the night the police came to the Defendant's house, the Defendant "raped" her. The Defendant contends that, because the victim did not clarify what she meant by the word "raped" as to that incident, the proof was not sufficient to establish sexual penetration.

We disagree. Earlier in her testimony, the victim explained that she understood rape to mean that the Defendant "had sex" with her, and further explained that having sex meant that the Defendant put his penis inside of her vagina. Medical proof established that the victim's hymen had been breached in a manner consistent with sexual penetration. The Defendant admitted that, on the night the police put him in the back of the patrol car, he had had sexual contact with the victim. We hold that this proof is more than sufficient to support the Defendant's conviction of rape of a child. The Defendant is not entitled to relief on this conviction.

*Criminal Exposure to HIV*

Our criminal code provides that "[a] person commits the offense of criminal exposure of another to human immunodeficiency virus (HIV) when, knowing that the person is infected with HIV, the person knowingly . . . [e]ngages in intimate contact with another." Tenn. Code Ann. § 39-13-109(a)(1) (2010). For the purposes of this offense, "intimate contact with another" is defined as "the exposure of the body of one person to a bodily fluid of another person in any manner that presents a significant risk of HIV transmission." Id. § 39-13-109(b)(2). This Court has opined that the statute "requires that for a defendant to be found guilty of criminal exposure of another to HIV via intimate contact, the prosecution need only show that the defendant subjected the victim to the risk of contact with the [d]efendant's bodily fluids." State v. Bonds, 189 S.W.3d 249, 258 (Tenn. Crim. App. 2005). Therefore, a male defendant's penile penetration of another

> is itself sufficient evidence of 'exposure of the body of one person to a bodily fluid of another person in [a] manner that presents a significant risk of HIV transmission.' The risk of the transfer of bodily fluids is self evident in such an activity, and such risk is all that is required under the Tennessee statute.

Id. at 260 (quoting Tenn. Code Ann. § 39-13-109(b)(2)).

In this case, the Defendant was convicted of committing this offense on the night of July 1-2, 2010, the same night on which he committed the rape of a child. The Defendant argues that "[t]here was no testimony that on this particular night the victim was exposed to the bodily fluid of defendant in any manner that presented a significant risk of HIV transmission." Again, we disagree. As set forth above, the proof was sufficient to support a finding that the Defendant sexually penetrated the victim on the night in question. As this Court previously has recognized, a defendant's sexual penetration of another is proof that the defendant exposed the victim to a significant risk of HIV transmission. See id. The proof also established that the Defendant had been informed of his HIV positive status in May 2009, over a year prior to the night in question. Moreover, the medical proof in this case established that the victim was HIV positive. We hold that the proof was sufficient to support the Defendant's conviction of criminal exposure to HIV. The Defendant is entitled to no relief on this conviction.

## Conclusion

For the reasons set forth above, we affirm the judgments of the trial court.


_____
JEFFREY S. BIVINS, JUDGE