IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE

Assigned on Briefs February 12, 2019

**STATE OF TENNESSEE v. TERRY LEON LANCASTER**

**Appeal from the Circuit Court for Stewart County**
**No. 2016-CR-83     Suzanne Lockert-Mash, Judge**

_____

**No. M2018-00111-CCA-R3-CD**

_____

Defendant, Terry Leon Lancaster, was indicted on four counts of rape of a child and four counts of aggravated sexual battery for events that took place during the summer of 2015 when the victim, then aged twelve, was staying at Defendant's home while attending vacation bible school.  At trial, the trial court dismissed Counts 1 and 2 of the indictment after a motion for judgment of acquittal.  The jury found Defendant guilty of the remaining counts of the indictment, two counts of rape and four counts of aggravated sexual battery.  Defendant was sentenced to an effective sentence of thirty years as a multiple offender.  Defendant appeals his convictions, arguing that the evidence presented at trial was insufficient.  We affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER and ROBERT L. HOLLOWAY, JR., JJ., joined.

Anthony L. Clark, Paris, Tennessee, for the appellant, Terry Leon Lancaster.

Herbert H. Slatery III, Attorney General and Reporter; Alexander C. Vey, Assistant Attorney General; Ray Crouch, District Attorney General; and Dani Bryson, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

According to the testimony at trial, C.G.,[1] the victim, lived in Henry County with her parents.  The victim had known Defendant since she was in the first grade after her "mother had started talking to his wife over Facebook and they started coming over to

_____

[1] It is the policy of this Court to refer to the victims of sexual abuse by their initials.

our house." She was around ten years old the first time she went to Defendant's house alone.

In late June of 2015, the victim went to stay with Defendant and his wife for a week at their home in Stewart County in order to attend vacation bible school at their church, Rock Creek Baptist Church. According to the pastor of the church, Richard Conley, vacation bible school took place from June 21-24 of 2015. At the time, the victim was in between her sixth and seventh grade years of school and was twelve years of age.

According to the victim, Defendant and his wife had children who had "moved out." She described their house as having three bedrooms but explained that "only two of them are actually used as a bedroom." When the victim went to Defendant's house, she usually "slept on the couch in the living room . . . [b]ecause it was either too warm or too cold" in the other bedroom. To occupy her time, the victim used her laptop and her "DS[2] playing games and doing crafts with his wife."

The victim explained that Defendant first approached her in the computer room on the second day she was at his house. They were the only two people in the room. The victim was "sitting on the floor and [Defendant] was playing games on the computer." Defendant "got tired of playing games and so he got up and he decided to hug [her]." The victim said this was unusual behavior and that the hug lasted "[a]bout five minutes" during which Defendant's "hands kept getting lower and lower" until he started "[g]rabbing" her "butt." At first, he touched her on the outside of her clothing "and then eventually after a little bit of time he went inside" her clothing and touched her bare skin. The victim did not tell him to stop because she was surprised by his actions. Defendant eventually stopped when they "went out to eat food." Defendant's wife was home at the time, "[i]n the kitchen at the kitchen table."

That same night around 9:00 p.m. when it was time for bed, the victim was laying on the couch in her pajama pants and a t-shirt. She recalled that she was wearing underwear but could not recall if she was wearing a bra at the time. Defendant's wife was already in bed. Defendant "c[a]me back because [the victim] was in a bad mood that day . . . and started talking to [her] and eventually it got sexual." Defendant told the victim "stories about other women he had slept with in public and then eventually he started feeling around [her] chest like the upper part of [her] chest." The victim was "uncomfortable" and just "looked" at Defendant who moved his hands lower to her "breasts" where they stayed for "[a]bout ten minutes." Defendant told her not to tell anyone about the incident. The victim was scared and "kept it a secret" because Defendant "had guns."

---

[2] The victim explained that a DS was a "game system" that was "similar to a Game Boy."

The next night, Defendant "started to take off [the victim's] shirt and he eventually went to where he went underneath [her] underpants and he started to inappropriately touch [her] there." Defendant also removed her underwear. The victim "didn't know what to say" and decided to stay quiet at that point. Defendant grabbed her "breasts and eventually went further down to [her] waist and started massaging and rubbing" before he put his fingers inside her vagina. Defendant "bent [his fingers] back and forth" inside her vagina for about "fifteen minutes" before they "got tired and he told [her] to go to bed."

The next day was "just a repeat of the previous day which is how it was until the last night" the victim was at Defendant's house. She recalled being there for five nights but did not "exactly remember" if that was the correct number of nights. She elaborated that on the fourth night, Defendant "tried to take off [her] clothes and he did and he continued to go inside." He again used his fingers on her vagina.

The victim recalled that Defendant "forced" her to touch his penis one night while she was at his house. She could not recall which night this occurred but remembered Defendant "lowered" his pants before he "grabbed [her] hand and put it on his penis." She moved her hand away. The victim described Defendant's penis as "hard." After she pulled her hand away, she looked at Defendant and "shook [her] head no."

The victim also recalled one time during the day that Defendant came up behind her while she was on her laptop and "grabbed" her breasts. On the fifth night, Defendant told the victim "that he was going to continue with that night but nothing happened the fifth night." Defendant told her he would like to "be [her] first," meaning he would like to be the one to take her virginity.

On cross-examination, the victim admitted that in May of 2016, she initially described three separate instances of abuse. She explained that "[i]t was five days but the beginning day and the end day nothing happened" and that the abuse occurred on "three different days" for a total of what she considered three times. She further explained that multiple events took place each day; for example on the "last day," Defendant "grabbed [her] breast" during the day and then "grabbed [her] breasts again and [used] his fingers" at night. On the first and second day of abuse, the victim explained that two separate instances occurred each day. The victim explained that she initially described what she thought were "seven" different instances of abuse but agreed that her testimony at the preliminary hearing indicated that there were "five" separate instances of abuse. She acknowledged that the jury had been told eight instances of abuse occurred based on the eight counts in the indictment but that she had always maintained that there were five separate instances of abuse, several of which included multiple types of abuse. The State attempted to discredit the victim's testimony because the victim denied attending a pool party at the home of the pastor of Rock Creek Baptist Church after vacation bible school.

Richard Conley testified that he remembered the victim attending a pool party in July or August of 2015 at his home.

The victim did not tell anyone about the abuse for a while but eventually told a friend from school. In February of 2016, Susan Powell, a teacher at the victim's school, confiscated a piece of paper that the victim attempted to pass to another student in the hallway. The paper read,

> Anorexia
> Molested
> Wasn't meant to be born
> Wasn't wanted to be born
> Been told that I'm regret[t]ed
> Atheist
> Beaten up several times
> Ignored

Ms. Powell described the victim as upset when the paper was taken away. Ms. Powell gave the note to the school counselor, Amy Vance. The victim explained that she was born "after several miscarriages" and had taken things her parents had said to her "the wrong way." She was the youngest of three siblings; her brother and sister were seven and ten years older than her, respectively. She explained that being "ignored" and "regret[t]ed" referred to treatment by friends. The victim denied telling Ms. Vance that her father was a "dooms day prepper" and had guns at the house.

Ms. Vance testified that she spoke with the victim after the note was retrieved by the teacher. Ms. Vance took notes during the meeting with the victim, but the notes were not entered into evidence. Ms. Vance confirmed that she would not have known the victim's father was a "dooms day prepper" had the victim not told her such. She explained that the victim's responses did not appear to be coached and that the victim did not appear to be "attention seeking." The victim was referred for a forensic interview. Kim Gibson, a former employee of the Carl Perkins Center in Henry County, testified that she performed a forensic interview of the victim.

Chief Deputy Mark McElroy of the Stewart County Sheriff's Department was the investigator assigned to the case. He confirmed that a forensic interview of the victim was conducted. He spoke "briefly" to Defendant's wife on two occasions and interviewed Defendant at length after giving *Miranda* warnings. Defendant was arrested at the conclusion of the interview. At trial, a redacted version of the audio recording of Defendant's interview was played for the jury. During the recording, Defendant insisted that "nothing occurred." He recalled a time when the victim "s[a]t on his knees" and then he "put his arm around her waist," but he had "always done that since she'd been little."

This time in particular, however, the victim "picked [his] hand up" and placed it on her "boob." He removed his hand, and the victim "did it again." Defendant claimed that he told his wife about the victim's actions. Defendant thought that the victim's allegations were "unbelievable" and commented that there "was absolutely nothing in this world that can come to [his] mind that would make [the victim] say something like that."

Defendant was initially charged with one count of rape of a child and three counts of aggravated sexual battery. After the case was presented the grand jury, Defendant was indicted on four counts of rape of a child and four counts of aggravated sexual battery. At the conclusion of the testimony at trial, the trial court granted a motion for judgment of acquittal with regard to two counts of rape because "[t]here's no indication of the other two." As to the remaining counts of the indictment, the State elected to rely on the following testimony to support the counts. For Counts 3 and 4, the State relied upon "[t]he rape [the victim] testified to on the third night and the fourth night, digital penetration." For Count 5, the State relied on "the second day in the computer room, when he grabbed her butt." For Count 6, the State relied on proof from "the third night that she stayed there when he pulled up her shirt and rubbed on her breasts." For Count 7, the State relied on "an unknown date [during the week] when she or when he had her touch his penis." For Count 8, the State relied upon "defendant's admission that the victim moved his hand to her breast."

The jury found Defendant guilty of Counts 3-8. After a sentencing hearing, the trial court sentenced Defendant to thirty years on Count 3 and thirty years on Count 4, as a Range III multiple offender, to be served concurrently with each other. The trial court sentenced Defendant to ten years on each count for Counts 5-8 as a Range I, standard offender, to be served concurrently with each other and the sentences in Counts 3 and 4, for a total effective sentence of thirty years.

After the denial of a motion for new trial, Defendant filed a timely notice of appeal.

*Analysis*

On appeal, Defendant argues that the evidence was insufficient to support the convictions. Specifically, he insists that the "only proof of the alleged offenses offered at trial was through the testimony of the alleged victim" and that the "inconsistencies" between her testimony during the preliminary hearing and the trial "demonstrate that [her] testimony is untrustworthy." The State disagrees.

Well-settled principles guide this Court's review when a defendant challenges the sufficiency of the evidence. A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt. *State v. Evans*, 838 S.W.2d 185, 191 (Tenn.

1992). The burden is then shifted to the defendant on appeal to demonstrate why the evidence is insufficient to support the conviction. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). On appeal, "the State is entitled to the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003). As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof. *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). We may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779. Further, questions concerning the credibility of the witnesses and the weight and value to be given to evidence, as well as all factual issues raised by such evidence, are resolved by the trier of fact and not the appellate courts. *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *Dorantes*, 331 S.W.3d at 379 (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

"Rape of a child is the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-13-522(a). "Sexual penetration" is defined as "sexual intercourse . . . or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required." T.C.A. § 39-13-501(7). In order to be convicted of aggravated sexual battery, the State had to prove that there was unlawful sexual contact between Defendant and the victim, who was less than thirteen years of age. T.C.A. § 39-13-504(a)(4). "Sexual contact" means the intentional touching of anyone's intimate parts—or the clothing covering those parts—if the touching can be "reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). The "primary genital area, . . . buttock[, and] breast" are each considered "intimate parts." T.C.A. 39-13-501(2).

The proof at trial, viewed in a light most favorable to the State, indicated that the victim stayed with Defendant and his wife at their home in Stewart County for about a week during the summer of 2015. The victim testified that on the second night at the house, Defendant gave her an unusually long hug in the computer room that eventually led to him grabbing her butt both over and underneath her clothing. Defendant digitally penetrated the victim's vagina on the third and fourth nights she stayed there. On the third night, he told her about various women he had sex with in public places, removed her panties, "grabbed" her butt, and eventually moved his hand "underneath" her underpants and inserted his finger into her vagina where he "bent" it back and forth for a

while.  On the third night, prior to inserting his finger into her vagina, Defendant also touched the victim's breasts.  On the fourth night, Defendant "continued to go inside" her vagina with his fingers.  On another occasion, Defendant put the victim's hand on his penis.  On the final occasion, Defendant himself described an incident where his hand touched the victim's breast while the victim was sitting in his lap.  At the time the incidents occurred, the victim was twelve.  Defendant even told the victim that he wanted to be the one to take her virginity.  Despite Defendant's argument to the contrary, it was within the jury's province to accredit the victim's testimony and convict Defendant upon that proof.  *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction.") (internal quotation omitted).  Moreover, much of Defendant's argument points to contradicting testimony from Ms. Vance concerning her notes about a conversation with the victim.  The notes were never actually introduced into evidence, and none of the contradictions pointed out by Defendant actually concern the victim's account of the rapes and aggravated sexual batteries that she alleged to have occurred. The discrepancies, if any, relate to information the victim shared with Ms. Vance about her family history and home life.  The jury clearly accredited the testimony of the victim. Defendant is not entitled to relief on this basis.

*Conclusion*

For the foregoing reasons, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE