IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 19, 2016

## STATE OF TENNESSEE v. LIZANDRO GUEVARA

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3488    Steve R. Dozier, Judge**

_____

### No. M2015-01719-CCA-R3-CD – Filed September 21, 2016

_____

Defendant, Lizandro Guevara, appeals his eight convictions for aggravated sexual battery and four convictions for rape of a child. He argues that the evidence is insufficient to support the convictions. Because the evidence within the record is sufficient for a rational jury to conclude beyond a reasonable doubt that Defendant committed the offenses for which he was convicted, the judgments of the trial court are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Manuel B. Russ (on appeal), Don Himmelberg (at trial), and Will Merrell (at trial), Nashville, Tennessee, for the appellant, Lizandro Antonio Guevara.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Assistant Attorney General, Senior Counsel; Glenn R. Funk, District Attorney General; and Kristen Menke and Anton Jackson, Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

Defendant was convicted as charged of eight counts of aggravated sexual battery and four counts of rape of a child against his stepdaughter, A.C.[1] Defendant received an

_____

[1] It is the policy of this Court to protect the identity of children who are victims of crime.

effective sentence of sixty-nine years to be served at 100%. The following evidence was presented at trial.[2]

A.C. was eleven years old at trial. Defendant was married to A.C.'s mother ["Mother"]. Neither A.C. nor her younger brother was Defendant's biological child. She began living with Defendant when she was approximately four or five years old. Eventually, Mother and Defendant had a daughter together.

Mother and Defendant moved in together on April 15, 2005, and they shared a house with other family members. A.C., her younger brother, and her younger sister (once born) lived downstairs with Mother and Defendant. Defendant's sister, her three children, and her husband lived upstairs.[3] The upstairs and downstairs portions of the home were separated.

A.C. recalled that the first instance of abuse occurred when she was five years old while her mother was assisting her little brother in the bathroom. Defendant called A.C. to him while he was sitting on "the big sofa" in the living room. When A.C. went to Defendant, he touched her genital area with his hands on the outside of her clothes. Defendant did not say anything to A.C., and no one else was in the living room. Defendant stopped touching A.C. when her mother exited the bathroom.

Defendant then began routinely molesting A.C. A.C. described three different occasions on which Defendant touched her genital area with his penis. One time in the living room, Defendant "used his bottom private part, and he put it in [her] private part." Defendant touched her with his penis both inside and outside her clothes. One time in A.C.'s bedroom, Defendant touched her genital area "inside [her] clothes, on the skin with his penis." One time in Defendant's bedroom, Defendant used his penis to touch the outside of A.C.'s genital area "kind of both" inside and outside her clothes.

A.C. recalled these encounters happening more than twice in each room. On all of these occasions, Defendant would initiate the contact by touching A.C.'s breasts, buttocks, and genital area with his hands. Other than the first time, A.C.'s mother would be at work when the incidents occurred.

When A.C. was six or seven, they moved to a different house. At this residence, Defendant's brother and his girlfriend lived with them, as well as Defendant's mother. A.C. testified that Defendant touched her on numerous occasions in his bedroom. He

---

[2] Given the nature of the issue presented in this appeal, Defendant's motion to accept his late filed appeal is granted in the "interest of justice." See Tenn. R. App. P. 4(a).

[3] Defendant testified that his brother-in-law's brother also lived upstairs.

would touch her buttocks with his hands and "usually" would touch her genital area with his penis. Defendant would touch her with his penis both on the outside and inside of her clothes but "usually" the contact was on the outside of her genitalia. However, the victim stated that, on more than one occasion, Defendant penetrated the inside of her genitalia.

These encounters occurred less frequently than every day but more than once a week. During the encounters, Defendant would ask A.C. if what he was doing to her felt good. On occasion, Defendant ejaculated onto A.C.'s genital area, and she would "go to the bathroom and wipe it off." Sometimes, Defendant would move A.C.'s hand along his penis, and sometimes A.C. touched his penis on her own.

A.C. and her family moved again in early 2009, and Defendant continued the same behavior, but in that house, he would use his bedroom and his brother's bedroom. When they moved to this third location, Defendant began making A.C. wear "skirts without shorts," although she also wore panties. Defendant touched A.C.'s genital area with his penis underneath her clothing on more than one occasion in his brother's bedroom, but the victim was "not sure" if he ever penetrated her in that room. Inside his own room, Defendant routinely touched A.C.'s genital area with his hands and his penis underneath her clothing. At least once, he penetrated her, but A.C. could not recall where they were in the house.

At the second and third houses, Defendant also made A.C. "suck his private part." When this happened, A.C. would "usually taste some nasty stuff" that came out of his penis. If Defendant tried to make A.C. "suck it" and she did not want to, he would pull her hair. In response to specific questioning, A.C. confirmed that Defendant penetrated her with his penis and also penetrated her with his hand in his bedroom at the second house. A.C. also confirmed that on more than one occasion, Defendant put his private part "inside" her buttocks, but she could not recall where that happened. A.C. said that there were occasions when her younger brother walked into the room when she was in bed with Defendant. A.C. remembered that her last encounter with Defendant was the same week that she disclosed the abuse.

When A.C. was eight or nine years old and in the third grade, she saw a "play about a guy trying to touch a girl." Afterward, she told a friend what Defendant was doing to her, and the friend encouraged her to tell the counselor at school. Pat Kellogg was the school counselor at A.C.'s elementary school. She organized and attended the awareness presentation in the school cafeteria and watched the reaction of the students after the play. She noticed A.C. crying and approached her with one of the actresses. A.C. "was just very shaken up, and she couldn't really talk very well." The actress said that A.C. had some things to tell Ms. Kellogg, but A.C. was "crying so hard . . . her body was shaking."

A.C. went with her friend to tell the counselor, and "a whole bunch of people came to the school and started asking [her] questions." A.C. explained that she waited to tell someone what was happening "because [Defendant] made [her] momma happy, and . . . he was the father to [her] sister."

Ms. Kellogg took A.C. and the actress to the parent conference room and attempted to calm A.C. Eventually, A.C. told Ms. Kellogg that "her stepfather put his body parts in her body parts," and Ms. Kellogg called the Department of Children's Services (DCS). The DCS representative arrived shortly before the school's dismissal time and informed Ms. Kellogg that A.C. would have to be released to Defendant. Ms. Kellogg objected, and the DCS representative explained that she would follow Defendant and A.C. home to investigate. Ms. Kellogg described what followed, "I'll never forget . . . the look on her face in that car. It was just like she was, I don't know, like she was just in despair, like she had lost hope."

Mother testified that Defendant worked part-time as a construction laborer and would frequently be home with her children in the afternoons while she was at work. At the second house, Defendant's brother and his girlfriend rarely interacted with A.C.'s family. The only time they were in the same part of the house was when they used the bathroom. Mother left her children in the care of Defendant's brother's girlfriend on only one occasion, and no men were home during that time.

Mother testified that after the investigation occurred, she confronted Defendant about the incident while A.C. and her brother were present. Mother asked A.C., "Did he do that to you?" and she said, "Yes." Mother then asked A.C.'s brother, "Did he do that to your sister?" and he said, "Yes." When Mother questioned Defendant, he "only put his head down." Mother understood Defendant's response to mean "that everything was true."

Beverly Cotton, a pediatric nurse practitioner at a medical clinic that specialized in medical forensic exams for children, testified as an expert in pediatric nursing. Ms. Cotton performed a forensic examination of A.C. and collected physical specimens with a "rape kit" on May 1, 2009. The medical record reflected that A.C. appeared to be without distress. She reported "some pain with urination," which she said typically occurred if she did not clean herself well. Ms. Cotton explained that A.C.'s reported urinary pain was not indicative of sexual abuse because it may have existed for other reasons. Ms. Cotton testified that A.C.'s genital exam was normal with no signs of injury. Ms. Cotton explained that such results were typical in child abuse cases, even in cases of reportedly long-term abuse.

The medical record also reflected that A.C. reported that her stepfather touched her private part and pointed to her genital area. A.C. said that she was touched more than one time and thought that the first time it occurred was in 2006. Regarding the first time, A.C. explained that her mother was in the bathroom when Defendant touched her genital area with his private part. Defendant was "shaking" and asked, "Does it feel good?"

A.C. volunteered that Defendant sometimes made her "lick that private thing." She also revealed that Defendant would pull her hair if she did not want to "lick" him. A.C. said that "little slimy stuff" would come out of Defendant's private and sometimes she could feel it in her private parts. A.C. said that Defendant's conduct only hurt her "when he rubs it in there a lot." She denied experiencing any bleeding and said that sometimes Defendant touched her inside and sometimes outside of her private part. A.C. stated that Defendant also touched her breasts with his hands. A.C. further reported that she was worried that a "test" would not confirm that she was being truthful and that she was worried that her mother would be mad at her.

A sperm sample was obtained from two inner labial swabs taken from A.C. Forensic DNA analyst Barbara Leal performed DNA testing on the sperm samples, which contained both epithelial cells and sperm cells. For the first swab, testing on the epithelial cells was inconclusive because there was not enough DNA material. The sperm cells produced a partial DNA profile that could not exclude Defendant as a contributor. Ms. Leal explained that this result meant that the DNA in the sperm cells came from a male in Defendant's paternal lineage.

Ms. Leal then mixed the sperm samples of both swabs in an attempt to obtain larger amounts of DNA material. The epithelial cells from the mixed samples were again inconclusive. The sperm cells from the mixed samples also produced a partial DNA profile that could not exclude Defendant as a contributor.

Defendant testified in his defense. He denied touching A.C. inappropriately. He also denied ever being alone with A.C. and her brother. According to Defendant, either Mother or her mother would be at home when the children returned from school. Defendant confirmed that one of his brothers lived with them at the second location and that a different brother lived with them at the third location. However, Defendant agreed that neither of his brothers had contact with A.C. Defendant suggested that A.C. made up the allegations because the day before she made the disclosure at school, he bought a video game for A.C.'s brother but did not get anything for her, and she got upset. On another occasion, A.C. became upset because Defendant did not buy her a birthday cake.

Upon his convictions, the trial court granted Defendant a delayed appeal.

*Analysis*

Defendant argues that the evidence was insufficient to support his convictions. This argument is predicated on two assertions. First, Defendant maintains that the DNA evidence was inadequate to prove Defendant's identity as the contributor of the sperm samples recovered from the victim's genitalia. Second, Defendant maintains that the victim's testimony was insufficient to establish the penetration required to sustain the four convictions for rape of a child. The State argues that the evidence presented at trial was legally sufficient. We agree with the State.

When a defendant challenges the sufficiency of the evidence, this Court is obliged to review that claim according to certain well-settled principles. The relevant question the reviewing court must answer is whether any rational trier of fact could have found the accused guilty of every element of the offense beyond a reasonable doubt. *See* Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). The jury's verdict replaces the presumption of innocence with one of guilt; therefore, the burden is shifted onto the defendant to show that the evidence introduced at trial was insufficient to support such a verdict. *State v. Reid*, 91 S.W.3d 247, 277 (Tenn. 2002). The prosecution is entitled to the "'strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom.'" *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). It is not the role of this Court to reweigh or reevaluate the evidence, nor to substitute our own inferences for those drawn from the evidence by the trier of fact. *Reid*, 91 S.W.3d at 277. Questions concerning the "'credibility of the witnesses, the weight to be given their testimony, and the reconciliation of conflicts in the proof are matters entrusted to the jury as the trier of fact.'" *State v. Wagner*, 382 S.W.3d 289, 297 (Tenn. 2012) (quoting *State v. Campbell*, 245 S.W.3d 331, 335 (Tenn. 2008)). "'A guilty verdict by the jury, approved by the trial court, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the prosecution's theory.'" *Reid*, 91 S.W.3d at 277 (quoting *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)). This standard of review applies whether the conviction is based upon direct evidence, circumstantial evidence, or a combination of the two. *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011); *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009).

Aggravated sexual battery is unlawful sexual contact with a victim less than thirteen years of age. T.C.A. § 39-13-504(a)(4). "Sexual contact" is defined as "the intentional touching of the victim's [or] the defendant's . . . intimate parts, or the intentional touching of the clothing covering the immediate area of the victim's [or] the defendant's . . . intimate parts, if that intentional touching can be reasonably construed as being for the purpose of sexual arousal or gratification." T.C.A. § 39-13-501(6). "Rape of a child is the unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." T.C.A. § 39-

13-522(a). "Sexual penetration" is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, however slight, of any part of a person's body or of any object into the genital or anal openings of the victim's . . . body, but emission of semen is not required." T.C.A. § 39-13-501(7).

Defendant maintains that the DNA evidence presented in this case "should have raised a reasonable doubt in the minds of any trier of fact as to the accuracy of the assertion that the semen came from [Defendant] himself." Defendant does not explain exactly how the results of the DNA testing render the evidence insufficient as to all of his convictions, but it appears to us that his argument is simply that the possibility that another male was the source of the semen means that someone else may have committed all of the alleged offenses, that is, that the victim has not accurately alleged or identified the true perpetrator. We acknowledge that the DNA evidence presented in this case was less than ideal. The epithelial cells from the sperm samples did not contain enough DNA to yield results, and the sperm cells only yielded partial DNA profiles. Nonetheless, the jury, as the trier of fact, was entitled to place whatever weight it deemed appropriate on the DNA results. Although the DNA evidence was imperfect, it was still relevant and still tended to prove Defendant's identity as its contributor. The fact that sperm samples where recovered at all from the victim's genitalia was significant in itself as corroboration for her story, and the partial DNA profile that was obtained from the sperm cells was consistent with Defendant's DNA profile, albeit with that of all males from Defendant's paternal lineage. The additional fact that two of Defendant's brothers also shared residences with the victim was something that the jury was entitled to consider, but it does not exonerate Defendant or invalidate the jury's verdicts. Moreover, the jury was instructed to consider the DNA evidence along with all other evidence presented, and the DNA evidence was not the sole evidence identifying Defendant as the perpetrator of these crimes. The victim's testimony alone was enough to permit the jury to reasonably conclude that Defendant was the perpetrator. *See State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." (internal quotation omitted)); *see also State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (holding that child rape victim's testimony was sufficient to support conviction). Defendant is not entitled to relief on this basis.

Next, Defendant points to testimony from Ms. Latoya Mitchell, a forensic interviewer at a child advocacy center, as evidence that "raises questions about the difficulty of the alleged victim in properly indicating what body parts she was referring to as well as failing to describe penetration to a degree that would permit a reasonable trier of fact to find [Defendant] guilty beyond a reasonable doubt." Ms. Mitchell conducted a forensic interview of the victim once the matter was being investigated by DCS. Her report and a video recording of the interview were introduced as evidence of a prior

consistent statement made by the victim. During cross-examination, when Ms. Mitchell was asked if the victim described vaginal penetration during the interview, Ms. Mitchell replied that the victim only described Defendant touching "the outside of her butt . . . on the skin and . . . his private part touching outside of her genitals."

We first point out that the jury was instructed that this evidence was to be considered only for purposes of determining the victim's credibility and not as substantive evidence of the offenses. *State v. Herron*, 461 S.W.3d 890, 905 ("Prior consistent statements . . . are not to be used as substantive evidence of the truth of the matter asserted and are to be used only to rehabilitate the witness's credibility."). Furthermore, all inconsistencies in the evidence are to be resolved by the jury as the trier of fact. We acknowledge that the victim had difficulty at trial, as she did during the forensic interview, with precisely describing the exact nature of the contact made by Defendant. However, the victim's testimony at trial was sufficient to permit a rational trier of fact to find that Defendant was guilty of rape of a child beyond a reasonable doubt.

The State made four elections to support its charges for rape of a child:

Count Nine . . . the defendant penetrated the victim's genital area with the defendant's fingers. The victim described that the defendant put his fingers inside the "slit" on her "private part." This occurred at [the second house].

Count Ten . . . the defendant penetrated the victim's genital area with the defendant's penis. The victim described that the defendant put his "private part" inside the "slit" of her "private part." This occurred at [the second house].

Count Eleven . . . the defendant forced the victim to perform fellatio on the defendant. The victim described that the defendant made her "suck his private thing" and "gooey stuff" went into the victim's mouth and "tasted horrible." The victim said that the defendant would force the victim to perform fellatio by pulling her hair and pushing the victim's head down toward his penis. This occurred at [the second house].

Count Twelve . . . the defendant forced the victim to perform fellatio on the defendant. The victim described that the defendant made her "suck his private thing" and "gooey stuff" went into the victim's mouth and "tasted horrible." The victim said that the defendant would force the victim to perform fellatio by pulling her hair and pushing the victim's head down toward his penis. This occurred at [the third house].

The victim's testimony at trial provided a factual basis for these elections made by the State. Although the victim never specifically testified to vaginal penetration, she did testify that Defendant touched her inside the "slit" of her "private part" on the occasions described above. Vaginal penetration is not required to support a conviction for rape—any penetration of the female genitalia is adequate to constitute the offense. *State v. Bowles*, 52 S.W.3d 69, 74 (Tenn. 2001) (citing *Hart v. State*, 21 S.W.3d 901, 905 (Tenn. 2000)). The victim also unequivocally testified to instances of forced fellatio at each of those two locations. Oral sex constitutes penetration as defined by the statute. T.C.A. § 39-13-501(7). As such, a rational jury was entitled to rely upon that evidence in convicting Defendant on four counts of rape of a child. Defendant is not entitled to relief on this basis.

## *Conclusion*

Because the evidence within the record is sufficient to support his convictions, Defendant is not entitled to relief. Accordingly, the judgments of the trial court are affirmed.

_____
TIMOTHY L. EASTER, JUDGE