IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs July 9, 2024

**STATE OF TENNESSEE v. LIZANDRO GUEVARA**

**Appeal from the Criminal Court for Davidson County**
**No. 2009-D-3488     Steve R. Dozier, Judge**

————————————————————

**No. M2023-01646-CCA-R3-CD**

————————————————————

The Petitioner, Lizandro Guevara, appeals the Davidson County Criminal Court's dismissal of his petition requesting DNA analysis of evidence pursuant to the Post-Conviction DNA Analysis Act of 2001.  Based upon our review, we affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which CAMILLE R. MCMULLEN, P.J., and ROBERT W. WEDEMEYER, J., joined.

Lizandro Guevera, Clifton, Tennessee, Pro Se.

Jonathan Skrmetti, Attorney General and Reporter; Johnny Cerisano, Assistant Attorney General; Glenn R. Funk, District Attorney General; and J. Wesley King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

In December 2009, the Davidson County Grand Jury indicted the Petitioner for four counts of rape of a child less than thirteen years old, a Class A felony, and eight counts of aggravated sexual battery when the victim less than thirteen years old, a Class B felony. The indictment alleged that the offenses occurred between October 7, 2005, and May 30, 2009.

In July 2011, a Davidson County Jury convicted the Petitioner as charged in the indictment.  He received an effective sixty-nine-year sentence to be served at one hundred percent, and this court affirmed the convictions on direct appeal.  *State v. Guevara*, No.

M2015-01719-CCA-R3-CD, 2016 WL 5266552, at *1 (Tenn. Crim. App. Sept. 21, 2016), *perm. app. denied* (Tenn. Dec. 15, 2016).

The facts recounted in this court's direct appeal opinion are as follows:

A.C. was eleven years old at trial. [The Petitioner] was married to A.C.'s mother ["Mother"]. Neither A.C. nor her younger brother was [the Petitioner's] biological child. She began living with [the Petitioner] when she was approximately four or five years old. Eventually, Mother and [the Petitioner] had a daughter together.

Mother and [the Petitioner] moved in together on April 15, 2005, and they shared a house with other family members. A.C., her younger brother, and her younger sister (once born) lived downstairs with Mother and [the Petitioner]. [The Petitioner's] sister, her three children, and her husband lived upstairs. The upstairs and downstairs portions of the home were separated.

A.C. recalled that the first instance of abuse occurred when she was five years old while her mother was assisting her little brother in the bathroom. [The Petitioner] called A.C. to him while he was sitting on "the big sofa" in the living room. When A.C. went to [the Petitioner], he touched her genital area with his hands on the outside of her clothes. [The Petitioner] did not say anything to A.C., and no one else was in the living room. [The Petitioner] stopped touching A.C. when her mother exited the bathroom.

[The Petitioner] then began routinely molesting A.C. A.C. described three different occasions on which [the Petitioner] touched her genital area with his penis. One time in the living room, [the Petitioner] "used his bottom private part, and he put it in [her] private part." [The Petitioner] touched her with his penis both inside and outside her clothes. One time in A.C.'s bedroom, [the Petitioner] touched her genital area "inside [her] clothes, on the skin with his penis." One time in [the Petitioner's] bedroom, [the Petitioner] used his penis to touch the outside of A.C.'s genital area "kind of both" inside and outside her clothes.

A.C. recalled these encounters happening more than twice in each room. On all of these occasions, [the Petitioner] would initiate the contact by touching A.C.'s breasts, buttocks, and genital area with his hands. Other than the first time, A.C.'s mother would be at work when the incidents occurred.

- 2 -

When A.C. was six or seven, they moved to a different house. At this residence, [the Petitioner's] brother and his girlfriend lived with them, as well as [the Petitioner's] mother. A.C. testified that [the Petitioner] touched her on numerous occasions in his bedroom. He would touch her buttocks with his hands and "usually" would touch her genital area with his penis. [The Petitioner] would touch her with his penis both on the outside and inside of her clothes but "usually" the contact was on the outside of her genitalia. However, the victim stated that, on more than one occasion, [the Petitioner] penetrated the inside of her genitalia.

These encounters occurred less frequently than every day but more than once a week. During the encounters, [the Petitioner] would ask A.C. if what he was doing to her felt good. On occasion, [the Petitioner] ejaculated onto A.C.'s genital area, and she would "go to the bathroom and wipe it off." Sometimes, [the Petitioner] would move A.C.'s hand along his penis, and sometimes A.C. touched his penis on her own.

A.C. and her family moved again in early 2009, and [the Petitioner] continued the same behavior, but in that house, he would use his bedroom and his brother's bedroom. When they moved to this third location, [the Petitioner] began making A.C. wear "skirts without shorts," although she also wore panties. [The Petitioner] touched A.C.'s genital area with his penis underneath her clothing on more than one occasion in his brother's bedroom, but the victim was "not sure" if he ever penetrated her in that room. Inside his own room, [the Petitioner] routinely touched A.C.'s genital area with his hands and his penis underneath her clothing. At least once, he penetrated her, but A.C. could not recall where they were in the house.

At the second and third houses, [the Petitioner] also made A.C. "suck his private part." When this happened, A.C. would "usually taste some nasty stuff" that came out of his penis. If [the Petitioner] tried to make A.C. "suck it" and she did not want to, he would pull her hair. In response to specific questioning, A.C. confirmed that [the Petitioner] penetrated her with his penis and also penetrated her with his hand in his bedroom at the second house. A.C. also confirmed that on more than one occasion, [the Petitioner] put his private part "inside" her buttocks, but she could not recall where that happened. A.C. said that there were occasions when her younger brother walked into the room when she was in bed with [the Petitioner]. A.C. remembered that her last encounter with [the Petitioner] was the same week that she disclosed the abuse.

When A.C. was eight or nine years old and in the third grade, she saw a "play about a guy trying to touch a girl." Afterward, she told a friend what [the Petitioner] was doing to her, and the friend encouraged her to tell the counselor at school. Pat Kellogg was the school counselor at A.C.'s elementary school. She organized and attended the awareness presentation in the school cafeteria and watched the reaction of the students after the play. She noticed A.C. crying and approached her with one of the actresses. A.C. "was just very shaken up, and she couldn't really talk very well." The actress said that A.C. had some things to tell Ms. Kellogg, but A.C. was "crying so hard . . . her body was shaking."

A.C. went with her friend to tell the counselor, and "a whole bunch of people came to the school and started asking [her] questions." A.C. explained that she waited to tell someone what was happening "because [the Petitioner] made [her] momma happy, and . . . he was the father to [her] sister."

Ms. Kellogg took A.C. and the actress to the parent conference room and attempted to calm A.C. Eventually, A.C. told Ms. Kellogg that "her stepfather put his body parts in her body parts," and Ms. Kellogg called the Department of Children's Services (DCS). The DCS representative arrived shortly before the school's dismissal time and informed Ms. Kellogg that A.C. would have to be released to [the Petitioner]. Ms. Kellogg objected, and the DCS representative explained that she would follow [the Petitioner] and A.C. home to investigate. Ms. Kellogg described what followed, "I'll never forget . . . the look on her face in that car. It was just like she was, I don't know, like she was just in despair, like she had lost hope."

Mother testified that [the Petitioner] worked part-time as a construction laborer and would frequently be home with her children in the afternoons while she was at work. At the second house, [the Petitioner's] brother and his girlfriend rarely interacted with A.C.'s family. The only time they were in the same part of the house was when they used the bathroom. Mother left her children in the care of [the Petitioner's] brother's girlfriend on only one occasion, and no men were home during that time.

Mother testified that after the investigation occurred, she confronted [the Petitioner] about the incident while A.C. and her brother were present. Mother asked A.C., "Did he do that to you?" and she said, "Yes." Mother then asked A.C.'s brother, "Did he do that to your sister?" and he said, "Yes." When Mother questioned [the Petitioner], he "only put his head down."

- 4 -

Mother understood [the Petitioner's] response to mean "that everything was true."

Beverly Cotton, a pediatric nurse practitioner at a medical clinic that specialized in medical forensic exams for children, testified as an expert in pediatric nursing. Ms. Cotton performed a forensic examination of A.C. and collected physical specimens with a "rape kit" on May 1, 2009. The medical record reflected that A.C. appeared to be without distress. She reported "some pain with urination," which she said typically occurred if she did not clean herself well. Ms. Cotton explained that A.C.'s reported urinary pain was not indicative of sexual abuse because it may have existed for other reasons. Ms. Cotton testified that A.C.'s genital exam was normal with no signs of injury. Ms. Cotton explained that such results were typical in child abuse cases, even in cases of reportedly long-term abuse.

The medical record also reflected that A.C. reported that her stepfather touched her private part and pointed to her genital area. A.C. said that she was touched more than one time and thought that the first time it occurred was in 2006. Regarding the first time, A.C. explained that her mother was in the bathroom when [the Petitioner] touched her genital area with his private part. [The Petitioner] was "shaking" and asked, "Does it feel good?"

A.C. volunteered that [the Petitioner] sometimes made her "lick that private thing." She also revealed that [the Petitioner] would pull her hair if she did not want to "lick" him. A.C. said that "little slimy stuff" would come out of [the Petitioner's] private and sometimes she could feel it in her private parts. A.C. said that [the Petitioner's] conduct only hurt her "when he rubs it in there a lot." She denied experiencing any bleeding and said that sometimes [the Petitioner] touched her inside and sometimes outside of her private part. A.C. stated that [the Petitioner] also touched her breasts with his hands. A.C. further reported that she was worried that a "test" would not confirm that she was being truthful and that she was worried that her mother would be mad at her.

A sperm sample was obtained from two inner labial swabs taken from A.C. Forensic DNA analyst Barbara Leal performed DNA testing on the sperm samples, which contained both epithelial cells and sperm cells. For the first swab, testing on the epithelial cells was inconclusive because there was not enough DNA material. The sperm cells produced a partial DNA profile that could not exclude [the Petitioner] as a contributor. Ms. Leal

explained that this result meant that the DNA in the sperm cells came from a male in [the Petitioner's] paternal lineage.

Ms. Leal then mixed the sperm samples of both swabs in an attempt to obtain larger amounts of DNA material. The epithelial cells from the mixed samples were again inconclusive. The sperm cells from the mixed samples also produced a partial DNA profile that could not exclude [the Petitioner] as a contributor.

[The Petitioner] testified in his defense. He denied touching A.C. inappropriately. He also denied ever being alone with A.C. and her brother. According to [the Petitioner], either Mother or her mother would be at home when the children returned from school. [The Petitioner] confirmed that one of his brothers lived with them at the second location and that a different brother lived with them at the third location. However, [the Petitioner] agreed that neither of his brothers had contact with A.C. [The Petitioner] suggested that A.C. made up the allegations because the day before she made the disclosure at school, he bought a video game for A.C.'s brother but did not get anything for her, and she got upset. On another occasion, A.C. became upset because [the Petitioner] did not buy her a birthday cake.

*Id*. at *1-4.

On direct appeal of his convictions, the Petitioner argued that the evidence was insufficient to support the convictions because the DNA evidence was "inadequate" to prove his identity as the contributor of the sperm recovered from the victim and that the evidence was insufficient to support the convictions of rape of a child because the victim's testimony failed to establish penetration. *Id*. at *4. Regarding the DNA evidence, this court stated as follows:

[The Petitioner] maintains that the DNA evidence presented in this case "should have raised a reasonable doubt in the minds of any trier of fact as to the accuracy of the assertion that the semen came from [the Petitioner] himself." [The Petitioner] does not explain exactly how the results of the DNA testing render the evidence insufficient as to all of his convictions, but it appears to us that his argument is simply that the possibility that another male was the source of the semen means that someone else may have committed all of the alleged offenses, that is, that the victim has not accurately alleged or identified the true perpetrator. We acknowledge that the DNA evidence presented in this case was less than ideal. The epithelial cells from the sperm samples did not contain enough DNA to yield results,

- 6 -

and the sperm cells only yielded partial DNA profiles. Nonetheless, the jury, as the trier of fact, was entitled to place whatever weight it deemed appropriate on the DNA results. Although the DNA evidence was imperfect, it was still relevant and still tended to prove [the Petitioner's] identity as its contributor. The fact that sperm samples were recovered at all from the victim's genitalia was significant in itself as corroboration for her story, and the partial DNA profile that was obtained from the sperm cells was consistent with [the Petitioner's] DNA profile, albeit with that of all males from [the Petitioner's] paternal lineage. The additional fact that two of [the Petitioner's] brothers also shared residences with the victim was something that the jury was entitled to consider, but it does not exonerate [the Petitioner] or invalidate the jury's verdicts. Moreover, the jury was instructed to consider the DNA evidence along with all other evidence presented, and the DNA evidence was not the sole evidence identifying [the Petitioner] as the perpetrator of these crimes. The victim's testimony alone was enough to permit the jury to reasonably conclude that [the Petitioner] was the perpetrator. *See State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that the testimony of a victim, by itself, is sufficient to support a conviction." (internal quotation omitted)); *see also State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (holding that child rape victim's testimony was sufficient to support conviction). [The Petitioner] is not entitled to relief on this basis.

Regarding the victim's testimony being insufficient to establish penetration, this court noted that the State elected four incidents, two involving vaginal penetration and two involving fellatio, to support the four charges of rape of a child. *Id*. at *5. This court concluded that the victim's testimony was sufficient to support the convictions. *Id*. at *6. Accordingly, this court affirmed the judgments of the trial court. *Id*. at *6.

The Petitioner filed a timely petition for post-conviction relief in which he argued that trial counsel was ineffective because, relevant to this appeal, trial counsel failed to prepare a trial strategy. *Guevara v. State*, No. M2020-00118-CCA-R3-PC, 2021 WL 1814143, at *9 (Tenn. Crim. App. May 6, 2021), *perm. app. denied* (Tenn. Aug. 4, 2021). During the evidentiary hearing, trial counsel testified that the DNA results "considerably strengthened" the State's case, that he investigated where the Petitioner's father and brother were located during the time period for the abuse, and that neither was around the victim. *Id*. at *5. Moreover, trial counsel said that "conversations with the Petitioner about his male relatives excluded their presence at the victim's home and their possibility as suspects." *Id*. Trial counsel stated that he interviewed every adult in the household for the time period of the abuse and that none of them could have testified that the Petitioner was

never alone with the victim or could have accounted for their whereabouts during the entire time period. *Id*.

In concluding that the evidence did not preponderate against the post-conviction court's conclusion that trial counsel was not ineffective, this court explained:

> Counsel testified that he and his law partner met with the Petitioner multiple times, in jail and at the courthouse, and informed him specifically of his sentencing exposure at trial and his options in light of the State's various offers. In preparation for trial, Counsel attempted to establish the Petitioner's innocence by way of interviewing the others present in and around the victim's family home, in the hopes of securing testimony that excluded the possibility of the Petitioner being alone with the victim; that testimony was not available from any potential witness. As the evidence mounted against the Petitioner, Counsel went on to explore other possible DNA contributors who could be used to place reasonable doubt in the jury's mind of the Petitioner being the abuser. No one sharing the Petitioner's DNA had been around the victim and so the possibility of the Petitioner's relatives being guilty was no longer viable. All the while, Counsel fielded offers from the State, including a very favorable one, which he presented to the Petitioner. This representation falls within the "wide range of reasonable professional assistance" and is entitled to deference on appeal. Accordingly, the Petitioner is not entitled to relief.

*Id*. at *10.

On October 3, 2023, the Petitioner filed a "hybrid" petition for DNA analysis of evidence and motion to reopen his post-conviction petition. As to his request for DNA analysis, which is the subject of the instant appeal, the Petitioner requested that (1) various items of clothing collected from the victim be tested for "touch" DNA and (2) untested biological samples collected from the victim be tested for DNA to determine whether the DNA matched the victim's biological father or another perpetrator. The Petitioner asserted that, whereas the DNA analysis performed by Ms. Leal only enabled her to conclude that he and his paternal relatives could not be excluded as possible contributors to the sperm sample collected from the victim, advanced DNA testing, such as autosomal DNA testing or genetic ancestry testing, could definitively exclude him as a contributor. The Petitioner noted that according to the laboratory report introduced into evidence at trial as exhibit 5, additional biological samples were collected from the victim and were not tested for DNA. The Petitioner contended that DNA testing on those samples would be exculpatory and, consequently, bolster evidence that the victim's biological father sexually abused her. The State did not file a response to the petition.

- 8 -

The post-conviction court denied the petition for DNA analysis. In doing so, the court stated:

> The Court makes a threshold finding that Petitioner was convicted of the requisite offenses for the Court to consider a petition. Tenn. Code Ann. § 40-30-303. From the appellate record, the DNA testing was less than ideal. *Guevara* at 2016 WL 5266552, [at] *5. However, semen was recovered from the victim's genitalia and was sufficient to establish a DNA profile consistent with Petitioner and all males in his paternal line. *Id*. Petitioner avers that the victim's biological father is the source of the semen and additional DNA testing would exonerate him. The Court disagrees with this presumption.
>
> The Court recalls little to no proof about the presence of the victim's biological father in her life. Within the case file, a Department of Children's Services report taken prior to the forensic interview indicates that the victim stated her biological father was incarcerated in Mexico. Thus, the Court has no constructive belief that Petitioner's claim can be substantiated. Further, the potential presence of a different DNA profile does not negate tested samples which established that Petitioner or an immediate, paternal-line relation was the source of the semen recovered from the victim. Other relatives were ruled out at trial or considered and discounted by the trier of fact.

Therefore, the post-conviction court concluded that under the mandatory provision of the DNA Analysis Act, the Petitioner failed to establish that a reasonable probability existed that he would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis.

The court then went on to conclude that under the discretionary provision of the Act, the Petitioner also failed to establish that a reasonable probability existed that analysis of the evidence will produce DNA results that would have rendered his verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction. As the court stated, "Again, the Court reiterates the potential presence of another contributor, which the Court observes was not found in the tested semen samples, does not negate the presence of a DNA profile establishing Petitioner or another close relation from his paternal line was the source."

## ANALYSIS

On appeal, the Petitioner contends that the post-conviction court erred by dismissing his petition for DNA analysis because the court misconstrued his argument to be that new

DNA analysis would reveal the presence of semen from the victim's biological father. The Petitioner contends that he actually was arguing that new testing could exclude him from being a contributor to the sperm sample recovered from the victim. The State argues that the post-conviction court properly denied relief because the Petitioner failed to establish all four criteria required for either mandatory or discretionary DNA analysis. We conclude that the post-conviction court properly dismissed the petition.

The Petitioner sought new DNA analysis of the evidence pursuant to both the mandatory and discretionary portions of the Post-Conviction DNA Act of 2001. The Act provides:

> [A] person convicted of and sentenced for the commission of first degree murder, second degree murder, aggravated rape, rape, aggravated sexual battery or rape of a child, the attempted commission of any of these offenses, any lesser included offense of these offenses, or, at the direction of the trial judge, any other offense, may at any time, file a petition requesting the forensic DNA analysis of any evidence that is in the possession or control of the prosecution, law enforcement, laboratory, or court, and that is related to the investigation or prosecution that resulted in the judgment of conviction and that may contain biological evidence.

Tenn. Code Ann. § 40-30-303.

> Testing is mandatory when:
>
> (1) A reasonable probability exists that the petitioner would not have been prosecuted or convicted if exculpatory results had been obtained through DNA analysis;
>
> (2) The evidence is still in existence and in such a condition that DNA analysis may be conducted;
>
> (3) The evidence was never previously subjected to DNA analysis or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and
>
> (4) The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id*. at § 40-30-304. Additionally, the court may, in its discretion, order testing when:

(1)  A reasonable probability exists that analysis of the evidence will produce DNA results that would have rendered the petitioner's verdict or sentence more favorable if the results had been available at the proceeding leading to the judgment of conviction;

(2)  The evidence is still in existence and in such a condition that DNA analysis may be conducted;

(3)  The evidence was never previously subjected to DNA analysis, or was not subjected to the analysis that is now requested which could resolve an issue not resolved by previous analysis; and

(4)  The application for analysis is made for the purpose of demonstrating innocence and not to unreasonably delay the execution of sentence or administration of justice.

*Id*. at § 40-30-305.

"Under either the mandatory or discretionary provision, all four elements must be met before DNA analysis will be ordered by the court." *Powers v. State*, 343 S.W.3d 36, 48 (Tenn. 2011).  A reasonable probability under the statute is a probability sufficient to undermine confidence in the conviction or prosecution. *Id*. at 55.  In conducting its analysis of a petitioner's claim, a post-conviction court must presume that the DNA analysis would produce favorable results for the petitioner.  *Id*.  "While courts must also consider the evidence that was presented against the petitioner at trial, the evidence must be viewed in light of the effect that exculpatory DNA evidence would have had on the fact-finder or the State."  *Id*. (citations omitted).  The post-conviction court is afforded considerable discretion in its decision whether to grant a petitioner relief under the Post-Conviction DNA Analysis Act, and its judgment will not be reversed unless unsupported by substantial evidence.  *See Jones v. State*, No. W2014-02306-CCA-R3-PC, 2015 WL 3882813, at *3 (Tenn. Crim. App. June 24, 2015).

Turning to the instant case, we note that the post-conviction court only addressed the first requirement for testing under Tennessee Code Annotated sections 40-30-304 and -305.  When a petitioner fails to satisfy the first requirement for mandatory or discretionary testing, neither the post-conviction court nor this court is required to consider the remaining three requirements.  *See Allen v. State*, No. E2022-00373-CCA-R3-PC, 2022 WL 16780005, at *5 (Tenn. Crim. App. Nov. 8, 2022), *perm. app. denied* (Tenn. Mar. 9, 2023).

Considering the first criteria of the statutes, namely, whether a reasonable probability exists that the Petitioner would not have been prosecuted or convicted if the

requested evidence had been obtained through DNA analysis and whether a reasonable probability exists that the requested DNA analysis would have produced a more favorable verdict or sentence if the results had been available at the proceedings leading up to the conviction or sentence, we conclude that the post-conviction court did not abuse its discretion by dismissing the petition. Initially, we note that the Petitioner claims on appeal that the post-conviction court misconstrued his petition as a request for DNA testing to show that the victim's biological father sexually abused her. However, the Petitioner stated several times in his petition that new DNA analysis could show that the victim's biological father was the perpetrator. In fact, the Petitioner stated on the first page of his petition:

> The main gist of Petitioner's claims in the instant hybrid *DNA* and Motion to reopen *Post Conviction* portions of the instant petition center around Petitioner's request that the court test the touch DNA profiles on various items of clothing collected [from] the victim, and untested biological DNA samples collected from the victim *in order to determine whether or not samples are a match to the biological father of the victim*-or some other perpetrator-as reported by L.C., the victim's younger step brother.

(Emphasis added.) DNA analysis pursuant to the Act, though, does not allow the Petitioner to collect a biological specimen from the victim's father for such comparison. *See Alley v. State*, No. W2006-01179-CCA-R3-PD, 2006 WL 1703820, at *9 (Tenn. Crim. App. June 22, 2006), *abrogated on other grounds by Powers*, 343 S.W.3d at 49-50.

As to the Petitioner's claim that new DNA analysis would exclude him as a contributor, the post-conviction court considered the proof at trial and this court's direct appeal opinion in which this court discussed the "less than ideal" DNA evidence. Significantly, this was not a "stranger-rape" case. *See Powers*, 343 S.W.3d at 58 (stating that "[p]articularly in 'stranger-rape cases,' 'DNA [has] changed the nature of criminal investigations . . . by making it possible to exculpate or inculpate suspects'") (quoting Brandon L. Garrett, *Claiming Innocence*, 92 Minn. L. Rev. 1629, 1652 (2008)). The victim testified, in detail, about years of sexual abuse by the Petitioner. The Petitioner testified that he was never alone with the victim, but the victim's mother testified that the Petitioner was alone with the victim often while the victim's mother was at work and that the victim's brother confirmed the Petitioner's abuse of the victim. The victim's mother also testified that when she confronted the Petitioner, she understood his silence and hanging his head to be an admission of guilt. Although the victim and her family lived with two of the Petitioner's brothers over the years, the victim's mother and even the Petitioner himself testified that his brothers did not have access to the victim, eliminating the possibility that they contributed the sperm sample. Trial counsel also was able to eliminate the Petitioner's father and other male relatives as suspects. Furthermore, the victim's father is not from

the Petitioner's paternal line and, therefore, would be eliminated as a possible DNA contributor.

We acknowledge that in determining whether a petitioner has established the criteria for DNA analysis, we are to presume that the new testing will be exculpatory. Nevertheless, we fail to see, and the Petitioner has not explained, how advanced DNA testing could exculpate him from the crimes when all other possible contributors have been eliminated. Therefore, under the facts of this case, we conclude that the post-conviction court did not abuse its discretion by denying the petition for DNA analysis.

## **CONCLUSION**

Upon review, we affirm the post-conviction court's summary dismissal of the petition.

_____
JOHN W. CAMPBELL, SR., JUDGE