IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
April 1, 2025 Session

**STATE OF TENNESSEE v. JAY WALKER**

**Appeal from the Criminal Court for Shelby County**
**No. 22-01215      Carlyn L. Addison, Judge**

_____

**No. W2024-00675-CCA-R3-CD**

_____

The Defendant, Jay Walker, appeals from his convictions for attempted first degree murder and employing a firearm during the commission of a dangerous felony. On appeal, the Defendant contends that the State failed to meet its burden of proving identity beyond a reasonable doubt and that the trial court gave an erroneous instruction to the jury during their deliberations. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and TOM GREENHOLTZ, JJ., joined.

W. Price Rudolph (on appeal); and John L. Dolan and Caroline Jasper (at trial), Memphis, Tennessee, for the appellant, Jay Walker.

Jonathan Skrmetti, Attorney General and Reporter; G. Kirby May, Assistant Attorney General; Steve Mulroy, District Attorney General; and Gavin A. Smith and Katie Ratton, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**I.      FACTUAL AND PROCEDURAL HISTORY**

This case stems from a two-vehicle collision and related shooting that occurred in the parking lot of a fire station in Memphis on December 6, 2021. The Defendant was indicted by a Shelby County grand jury on April 7, 2022, for attempted first degree murder wherein the victim, Terrica Kuykendall, suffered serious bodily injury and employing a firearm during the commission of a dangerous felony. *See* Tenn. Code Ann. §§ 39-12-101;

-13-202; -17-1324.  Following a four-day jury trial in February 2024, the Defendant was convicted as charged of both offenses.

The incident that gave rise to these convictions was captured on the fire station's video surveillance recording system, and this footage was introduced as an exhibit at trial. On the video, a silver SUV turns into the parking lot of the fire station, quickly followed by a bright pink sedan, and the vehicles stop with their front bumpers very close together. As the SUV begins traveling past the sedan, the sedan accelerates and collides with the rear bumper of the SUV, and it then reverses before accelerating again to collide with the side of the SUV.  At that point, the driver of the sedan exits the vehicle and discharges a firearm several times into the driver's side of the SUV.  When the SUV begins to roll forward, toward the four-lane road adjacent to the parking lot, the driver of the sedan gets back into the vehicle and collides with the rear bumper of the SUV, propelling the SUV into traffic. The driver of the sedan exits the vehicle and begins moving away from the scene on foot. After the SUV comes to rest on the opposite side of the street, the passenger door opens, and the occupant is visible exiting the vehicle from that side while the driver of the sedan is still visible in the video frame.

The victim in this case testified that she was the driver of the silver SUV, and she was also the owner of the pink sedan, but the Defendant often drove that vehicle.  She identified the Defendant as her ex-fiancé.  The two of them were living in the same apartment at the time of this incident because of the length of the lease, but they had not been romantically involved since earlier that year.  Around 10:30 p.m. on December 5, 2021, the victim and her friend were present in the apartment when the Defendant arrived home and began demanding to see the victim's phone.  When the victim refused, the Defendant made a comment to her friend that she would soon be "putting flowers on" the victim, which the victim understood to mean her grave.  The Defendant also told the victim that, if he ever caught her with another man, he would "head shot" her and the man she was with, stating, "[I]f I can't have you, nobody else can."

The victim left the apartment in the silver SUV shortly before 11:00 p.m. and drove first to the bank and then to her sister's home.  On her way to the bank, the Defendant pulled up next to her vehicle in the pink sedan and accused her of lying about where she was going.  After she arrived at her sister's home, while sitting in her parked vehicle, the Defendant arrived and shouted at the victim that she "better not have" another man in the vehicle with her.  The victim left her sister's home and spent the remainder of the night in her vehicle in the parking garage at her place of employment.

Early in the morning on December 6, 2021, after the Defendant had been calling and texting her throughout the night demanding that she return home, the victim drove to Walmart. After she parked her vehicle at Walmart, the Defendant arrived, driving the pink sedan. He exited the vehicle and said, "[L]et me get my tracker off your car[.]" The victim opened her vehicle door and "didn't move" while the Defendant retrieved a tracker from underneath the steering wheel of her SUV. She knew "nothing about a tracker until he took it off [her] car." As the victim attempted to drive out of the Walmart parking lot, the Defendant accused her of stealing from him. The Defendant then got back into the pink sedan and pursued the victim as she drove away.

This pursuit ended when the victim turned into the parking lot of the fire station at approximately 7:30 a.m. At that point, the Defendant crossed the four-lane road to also turn into the fire station and stopped "front bumper to bumper" alongside her vehicle. The victim attempted to continue driving, but the Defendant "rammed" the pink sedan he was driving into her vehicle multiple times. When her vehicle had been hit two to three times, and was now facing the direction she came from, the victim saw the Defendant get out of the pink sedan. Although she was not looking at him after she saw him exit the vehicle, she stated that the Defendant began shooting into the driver's side of her vehicle. The victim stated that while her car was "rolling" forward, the Defendant got back into the pink sedan and "pushed [her] car up" into traffic on the four-lane road. The victim was able to exit the passenger side of her vehicle after it came to rest on the opposite side of the road. At that point, she saw the Defendant moving on foot across the street. The victim said, "Damn, you really shot me," to which the Defendant responded, "B----, I told you I'd kill you," before walking away from the scene. On cross-examination, the victim maintained that she and the Defendant were able to hear one another without yelling, despite the traffic and rainy weather conditions that day. When pressed, the victim repeated what the Defendant had said to her and added, "I turned and faced [the Defendant]. [The Defendant] looked me right in my face. . . . I heard exactly what [the Defendant] said."

The victim's medical records from her time in the hospital following this incident were introduced into evidence. She also testified that she suffered seven gunshot wounds, which required several surgeries, and that she had no feeling in her left side and no bones in her left hand following this incident.

Officer Daniel Boice with the Memphis Police Department ("MPD") testified that he was the first officer who responded to the scene of the shooting, and he observed front end damage to the unoccupied pink sedan that was still present on the scene. Officer Boice informed the jury that the victim provided him with the Defendant's name at the scene, and a recording of his body camera footage was introduced into evidence. Sergeant Michael

Boyd, also with MPD, testified that he interviewed the victim at the hospital several days after this incident. Sgt. Boyd stated that the victim identified the Defendant by name as her assailant and recounted her narrative of the incident. A recording of his body camera footage containing this statement was also introduced into evidence.

After the close of the proof, closing arguments, and instruction by the trial court, the jury began its deliberations. During this process, the jury submitted the following question: "If all jurors cannot agree on the first count (guilty plea), must we then all agree on a unanimous not guilty plea before moving to the lesser charge?" As the parties discussed how to respond to this question, defense counsel stated, "I think they do need an instruction that their verdict has to be unanimous." The trial court responded, "I gave them that instruction. I said unanimous about [eighteen] times."[1]

However, the trial court determined that clarification was needed "because they've mentioned guilty plea twice on this note, twice." The trial court then gave the following instruction to the jury:

> All right. So we've got a question. Just want to clarify some points because it's a lot of information that you had to take in today, right. You're working with this packet [of printed jury instructions] and everybody is not sophisticated in the law. You're a layperson interpreting the law. I get that. So let me help some with what I think is confusion.

---

[1] The trial court gave the following instruction on unanimity prior to the jury's deliberations:

> Unanimous verdict. Any verdict you reach in the jury room, whether guilty or not guilty, must be unanimous. Your deliberations will be secret. You will never have to explain your verdict to anyone. The verdict must represent the considered judgment of each juror. In order to return a verdict, it is necessary that each juror agree thereto. Your verdict must be unanimous.

> It is your duty as jurors to discuss the case with one another and to deliberate with a view to reaching an agreement if you can do so without violence to individual judgment. Each of you must decide the case for yourself but only after a full consideration of the evidence with the other members of the jury.

> In the course of your deliberations, do not hesitate to reexamine your personal views and change your opinion if convinced it is erroneous. However, do not surrender your honest conviction as to the weight or effect of the evidence solely because of the opinion of your fellow jurors, or for the mere purpose of returning a verdict.

Nothing you're doing involves a guilty plea. [The Defendant] entered a not guilty plea, which is why he's having a trial. So the language here that you're using should only be verdict, right? We're looking for a verdict. So if all jurors cannot agree on the first count guilty plea, unh-unh, that's not what we're doing. We're looking for a verdict.

Now everyone must agree because your verdict has to be unanimous. It's not majority rules. It's not the person, the foreperson picks the charge. All [twelve] of you have to agree as to each and every element of the offenses. You cannot move to the next one until you—you've got to resolve the first one and then move to the next one if you can't resolve the first one.

Now the second portion of your note says: Must we then all agree on a unanimous not guilty plea? Again, he has entered a plea of not guilty. You're looking for a verdict. You must find him not guilty is the language. Let's take plea away from that. Or you must find him guilty if the State satisfied their burden.

So yes, unanimous, all, all [twelve]. Verdict is what we're looking for. Start at the top, unanimous. Okay. Are you the foreman? Okay. If there's another question, hash it out in the back, flip the light. We will stay here.

But again, start at the top unanimous all [twelve]. If not, you move on, move on, you move on. We're looking for a verdict. We already have our plea. Okay. See you in a bit if you have a question. I'm not rushing you. No one has anywhere to be. I mean, y'all do.

Within an hour of receiving this instruction, the jury returned a verdict of guilty as charged on both counts of the indictment.

At a subsequent sentencing hearing, the Defendant received an effective sentence of thirty-one years to serve in the Tennessee Department of Correction. Following the trial court's denial of his motion for new trial, the Defendant filed a timely notice of appeal.

## II.   ANALYSIS

The Defendant raises two issues on appeal. First, he asserts that the evidence was not sufficient to support his convictions due to a lack of proof of identity. Second, utilizing

plain error review, he asserts that the question submitted by the jury during their deliberations indicated that they were deadlocked, but the trial court failed in its duty to give an appropriate instruction pursuant to *Kersey v. State*, 525 S.W.2d 139 (Tenn. 1975).

## A.     Identity

The Defendant contends that, based on the surveillance video of this incident, the victim was not well-positioned enough to identify the Defendant as the shooter. The State responds that the victim had ample opportunity to identify the Defendant during the course of this incident, and she was rigorously cross-examined regarding this identification at trial.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

The identity of the perpetrator is an essential element of any crime. *State v. Miller*, 638 S.W.3d 136, 158 (Tenn. 2021) (citations omitted). The State has the burden of proving the identity of the defendant as the perpetrator beyond a reasonable doubt. *State v. Sneed*, 908 S.W.2d 408, 410 (Tenn. Crim. App. 1995) (citing *White v. State*, 533 S.W.2d 735, 744

- 6 -

(Tenn. Crim. App. 1975)). Identity is a question of fact for the jury's determination upon consideration of all competent proof. *State v. Thomas*, 158 S.W.3d 361, 388 (Tenn. 2005) (appendix). As with any sufficiency analysis, the State is entitled to the strongest legitimate view of the evidence concerning identity contained in the record, as well as all reasonable inferences which may be drawn from the evidence. *See id*. (citing *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992)); *see also Miller*, 638 S.W.3d at 158-59.

The Defendant argues that no reasonable juror could find that the "victim . . . could have made an effective identification of the [Defendant.]" The Defendant focuses on the victim's positioning in her vehicle at the moment the Defendant started shooting at her. This argument lacks merit. The proof at trial established that, at numerous points in time during this chain of events, the victim *did* have a clear view of the Defendant. The victim cohabitated with the Defendant; she had been embroiled in an altercation with him that spanned the entirety of the night before, leading up to the shooting itself; she owned the vehicle he was driving and was, therefore, familiar with its appearance; she saw him get out of this vehicle in the moments before the shooting; and, she interacted with him directly and personally both immediately before and immediately after he assaulted her. A victim's testimony alone is sufficient to support a guilty verdict. *State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony of a victim, by itself, is sufficient to support a conviction.'" (quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993))). To that end, the victim's identification of the Defendant as the shooter was specific and unwavering. Moreover, her testimony at trial also matched both the surveillance video and the recorded statement she gave to law enforcement while still in the hospital following this incident, both of which were published to the jury in this case. It is the province of the jury to accept or reject the evidence presented at trial. *See Bland*, 958 S.W.2d at 659. The jury's verdict in this case accredited the victim's testimony regarding the identity of her assailant, as was its prerogative. *See Grace*, 493 S.W.2d at 476. The Defendant is not entitled to relief.

## B. Jury Instruction

The Defendant concedes that he did not raise a contemporaneous objection at trial to the clarifying instruction given to the jury during its deliberations, but he urges this court to examine the propriety of the instruction under plain error review. In so doing, he asserts that the jury was deadlocked and should therefore have been given the specific unanimity instruction promulgated by the Tennessee Supreme Court in *Kersey*, 525 S.W.2d at 145. The State responds that the trial court's instruction was responsive to the phrasing of the jury's question, it merely paraphrased its earlier instruction, and the record does not clearly establish that the jury was deadlocked.

In conducting plain error review, our court will reverse for plain error only if the five following prerequisites are satisfied:

> (a) the record must clearly establish what occurred in the trial court; (b) a clear and unequivocal rule of law must have been breached; (c) a substantial right of the accused must have been adversely affected; (d) the accused did not waive the issue for tactical reasons; and (e) consideration of the error is 'necessary to do substantial justice.'

*State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000) (quoting *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994)). All five factors must be present in the record before an appellate court will recognize the existence of plain error, and complete consideration of all the factors is not necessary when it is clear from the record that at least one factor cannot be established. *Id*. at 283. In order to warrant plain error relief, the magnitude of the error must have been so significant "that it probably changed the outcome of the trial." *Adkisson*, 899 S.W.2d at 642 (quoting *United States v. Kerley*, 838 F.2d 932, 937 (7th Cir. 1988)). Plain error relief should be "sparingly exercised[,]" *see State v. Bledsoe*, 226 S.W.3d 349, 354 (Tenn. 2007), and is only appropriate for errors that are "especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding," *State v. Page*, 184 S.W.3d 223, 231 (Tenn. 2006). A defendant has the burden of persuading the appellate court that plain error exists. *Bledsoe*, 226 S.W.3d at 355.

At the outset, we note that the Defendant's reliance on the need for strict compliance with *Kersey* is misplaced in this instance. The trial court provided the unanimity instruction contemplated in *Kersey* during the main charge; under such circumstances, *Kersey* states that this instruction "*may* be repeated should a deadlock develop." 525 S.W.2d at 145 (emphasis added). Nothing in *Kersey* expressly *requires* the trial court to repeat the instruction in the event of a deadlock. And, on this record, it is not clear that the jury was actually deadlocked, nor did the trial court direct its comments to any jurors possibly in the minority of any alleged deadlock. *See id.* at 144. The trial court's clarifying instruction was directed to the jury as a whole, reiterated its previous instructions regarding the order of consideration and need for unanimity, and appeared designed solely to clear up misconceptions related to terminology. As such, *Kersey* is inapplicable to these facts, and the Defendant has not demonstrated that a clear and unequivocal rule of law was otherwise breached. *See Smith*, 24 S.W.3d at 282; *see also State v. Cole*, No. W2009-00174-CCA-R3-CD, 2010 WL 4951593, at *12-13 (Tenn. Crim. App. Dec. 6, 2010) (holding that the trial court was not required to repeat the *Kersey* unanimity instruction given during the

main charge upon receiving a question from the deliberating jury).  Therefore, our plain error review need not proceed further.  *Id.* at 283.  The Defendant is not entitled to relief.

## III.    CONCLUSION

Based upon the foregoing and consideration of the record as a whole, we affirm the judgments of the trial court.

 s/ Kyle A. Hixson
KYLE A. HIXSON, JUDGE