IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs March 3, 2026

**STATE OF TENNESSEE v. J.P. BURROW, JR.**

**Appeal from the Criminal Court for Shelby County**
**No. 21-01205    Jennifer Johnson Mitchell, Judge**

———————————————

**No. W2025-00788-CCA-R3-CD**

———————————————

The Defendant, J.P. Burrow, Jr., appeals his convictions for two counts of rape of a child, two counts of aggravated sexual battery, and one count of sexual battery by an authority figure. Specifically, the Defendant contends that the evidence was insufficient to support his convictions because the proof consisted solely of the victims' testimony with "no other corroborating evidence." Additionally, as to his conviction for sexual battery by an authority figure, he argues that the evidence failed to show that he qualified as an authority figure, pursuant to Tennessee Code Annotated section 39-13-527, at the time the offense took place. After review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

KYLE A. HIXSON, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Phyllis Aluko, District Public Defender; and Tony N. Brayton (on appeal), Charles Brent Walker, and Megan Moceri (at trial), Assistant District Public Defenders, for the appellant, J.P. Burrow, Jr.

Jonathan Skrmetti, Attorney General and Reporter; William C. Lundy, Assistant Attorney General; Steve Mulroy, District Attorney General; and Dru Carpenter and Nicole Germain, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

## I. FACTUAL AND PROCEDURAL HISTORY

This case involves the Defendant's alleged sexual abuse of C.T. and G.H.,[1] the daughters of his long-time girlfriend, over a continuous period in Memphis from April 22, 2011, to January 16, 2021. Based on these acts, on June 10, 2021, a Shelby County grand jury returned a five-count indictment against the Defendant, charging him with two counts of rape of child, two counts of aggravated sexual battery, and one count of statutory rape by an authority figure. *See* Tenn. Code Ann. §§ 39-13-504, -522, -532. The Defendant proceeded to a trial by jury on February 10, 2025.

C.T., who was nineteen at the time of trial, provided her date of birth and explained that the Defendant was her mother's ex-boyfriend and the biological father of her youngest sister. The Defendant had been part of C.T.'s life for nearly a decade and had been living with C.T., her mother, and her younger sister, G.H., since C.T. was around six years old. Over the years, the victims' mother left the Defendant "in charge" of C.T. and her sisters when the victims' mother was at work. In addition to watching the victims, the Defendant also disciplined them throughout the years. The Defendant was both "nice" and "aggressive," and C.T. confirmed that the Defendant was physically abusive toward her mother. However, the Defendant never acted aggressively around other people, and C.T. resented him for this behavior. C.T. additionally mentioned that, from the ages of six to thirteen, the Defendant gave her "weed," which she never smoked and always gave back to him.

The Defendant began sexually abusing C.T. when C.T. was around six years old, in 2010 or 2011. At that time, she, her mother, G.H., and the Defendant lived in Kenilworth Apartments. While in the bedroom that C.T.'s mother and the Defendant shared, the Defendant blindfolded C.T., telling her that he would give her candy if she complied. Once blindfolded, he instead put his penis in her mouth and made her perform oral sex on him. The Defendant threatened to hurt C.T.'s mother and G.H. if C.T. told anyone what had happened.

From Kenilworth Apartments, the family, including the Defendant, moved into a house on Marlene Street. By this time, C.T.'s youngest sister had been born. Here, the Defendant put his penis in C.T.'s vagina "more than once." The first time this happened, the Defendant called C.T. to the back of his bedroom. There, he told her to take off her clothes. The Defendant then pushed her onto the bed, took off her pants, and "[stuck] his

---

[1] It is the policy of this court to refer to minors and victims of sexual offenses by their initials.

penis in [her] vagina." C.T. said "it hurt[]," and when she told the Defendant this, he got "Vaseline or lotion," rubbed it on his penis and her vagina, and continued this action. C.T. also confirmed that the Defendant had put his penis "in [her] butt." The first time he did this, the two were in the laundry room, which was a big room at the back of the Marlene Street house that had a couch and was where the family put their laundry. The Defendant pulled down her pants, forced her hands down, and told her not to tell anyone. He then "[stuck] his penis in" her bottom.

The Defendant also touched C.T. in various places on her body, including her vagina and on her breasts, both on top of and underneath her clothes. She recalled a specific time that the Defendant touched her breasts underneath her clothes when the two were in the laundry room. On another occasion at the Marlene Street house, C.T. walked into the Defendant and her mother's bedroom and saw G.H. performing oral sex on the Defendant. C.T. pushed G.H. off the Defendant. The Defendant then told C.T. that if C.T. "didn't do it, [G.H.] would have to do it." G.H. left the room, and C.T. felt like she had to comply with the Defendant's ultimatum to protect her little sister.

A few years later, the Defendant and C.T.'s mother ended their romantic relationship. C.T., her mother, and her two sisters moved into a house at Foxhall Cove. While the Defendant did not move into the house with them, he continued to visit his biological daughter, the youngest sister, and was still part of C.T.'s life. He visited the house when C.T.'s mother was not home. During one of these visits when C.T. was thirteen years old, the Defendant tried to "make out" with C.T., "force" himself "up on" her, and called her "his little girlfriend." During another visit around this time, the Defendant "penetrated" C.T. by sticking his penis inside her vagina while in C.T.'s bedroom.

When C.T. was fifteen years old, she confided in her boyfriend that the Defendant had sexually abused her, and her boyfriend encouraged her to tell her mother. Later, during an argument between C.T. and her mother concerning C.T.'s behavioral issues and C.T.'s potentially being pregnant, C.T. disclosed the sexual abuse that had occurred at the hands of the Defendant. C.T.'s mother was "shocked" and began "panicking" and crying. C.T.'s mother called law enforcement, and once law enforcement arrived, C.T. and G.H. gave their statements regarding the abuse. C.T. noted that, while G.H. was normally not "very emotional," and generally "close[d] off her emotions . . . by being a comedian[,]" G.H. cried when giving her statement to law enforcement. C.T. explained that she had never previously disclosed the abuse because she was scared due to the Defendant's threatening her mother and her younger sisters. As she had witnessed the Defendant's physical abuse of her mother, she believed his threats.

- 3 -

G.H., who was seventeen at the time of trial, provided her birthdate and stated that the Defendant was her mother's ex-boyfriend and the youngest sister's biological father. She described the Defendant as a father figure and said that she could not remember a time when he was not in her life. The Defendant used to watch her and her sisters when their mother was at work, and he disciplined them by yelling at them, "ground[ing]" them, and "whoop[ing]" them with a belt. While the Defendant acted both "nice" and "mean," G.H. confirmed that he would "get physical" with her mother.

G.H. recalled that, when the family lived at the house on Marlene Street, the Defendant made her perform oral sex on him "more than once." When this happened, the Defendant made her get on her knees while he pulled down his pants and made her "suck his private part." G.H. remembered that the first time this happened, she was eight or nine years old, and she and the Defendant were in the laundry room. Another time, C.T. walked in on G.H.'s performing oral sex on the Defendant. C.T. told the Defendant to stop and told G.H. to get up. G.H. complied and left the room. G.H. noted that C.T., as her older sister, "watch[ed] out" for her.

G.H. stated that the Defendant also touched her on her breasts over her clothes and recalled a time when he did this while the two were alone in the laundry room. She noted that, when these incidents happened, her mother was not at the house, and the Defendant would act "nice" and offer her things like candy. When she, her mother, and her two sisters moved to Foxhall Cove, the Defendant did not move with them, but he still visited the house.

She confirmed that she had not disclosed the abuse to anyone prior to speaking with the authorities and that such incidents were difficult for her to think about and discuss. On the night her mother called law enforcement regarding the sexual abuse, G.H. wanted to talk to law enforcement but found it difficult to do so because she had tried to "block [it] out[.]"

The victims' mother identified the Defendant as her ex-boyfriend and the biological father of the youngest of the sisters. The two started dating in 2009 and moved into Kenilworth Apartments together in 2010. At this time, C.T. was around six years old and G.H. was approximately three years old. However, the Defendant "[got] into it with somebody," and they had to move. In 2014, they moved from Kenilworth Apartments into a house on Marlene Street. C.T. was around nine or ten years old, and G.H. was approximately six years old. After a few years, she and the Defendant ended their relationship, and in December 2017, she and her daughters moved into a house at Foxhall Cove. She confirmed that, even though she and the Defendant were no longer romantically

involved, he came to visit his daughter at the new home and was "a presence" in her and her daughters' lives.

The victims' mother confirmed that the Defendant had been physically abusive toward her during their relationship, and she was aware that C.T. and G.H. had witnessed the abuse. However, although she knew the Defendant could be aggressive, she thought the abuse was "contained" to her and did not think he would harm her daughters. As such, she left her daughters in the Defendant's care while she was at work and trusted him to "keep them safe[.]" The victims' mother first learned of the sexual abuse during an argument with C.T. The victims' mother noted that C.T. had recently developed behavioral issues and was possibly pregnant. The victims' mother indicated that when she learned of the abuse, she was "shocked" and "devastated." G.H. was not in the room when C.T. disclosed the abuse to her, so she called G.H. into the room. When she questioned G.H. about the abuse, "it was like [G.H.'s] soul left her body."

The victims' mother stated that the Defendant's actions had affected her and the victims' lives "completely." It had left a "hole in [her] heart," and she could no longer trust easily. She noted that C.T. and G.H. still suffered from the effects of the abuse and explained that C.T. has nightmares and was afraid that the Defendant might "come . . . and do something to her." G.H. "just . . . shut[s] down." The victims' mother confirmed that C.T. was the type of person who tried to be "strong for everyone" and "shoulder[ed] everything for everyone." She also agreed that G.H. was shy and was someone who "ke[pt] everything bottled up[.]"

On January 16, 2021, Officer Kimberly Boulton with the Memphis Police Department responded to a call at a Foxhall Cove house regarding a rape. At the house, Officer Boulton spoke with C.T. and G.H. together. She noted that the two victims finished each other's sentences like they were "in tune" explaining what had happened. Officer Boulton recalled that G.H. was "very timid" at first and then became "very emotional" when she began to elaborate on the sexual abuse. C.T. was "more straightforward" and tried to console G.H.

Following the State's case-in-chief, the Defendant elected to testify. He denied ever sexually abusing the victims. He explained that he and the victims' mother met through a friend in 2009 and moved in together a few months after meeting. He confirmed that he took on a stepfather role with the victims and was in their lives for a significant period of time. As he watched them grow, he considered C.T. and G.H. to be his daughters. He confirmed that he watched the victims when their mother was at work and disciplined them at their mother's request. He confirmed this discipline involved "whoop[ing]" them with

- 5 -

a belt and yelling at them; however, he asserted that the victims' mother was always present when he did this. While he acknowledged that he was physically abusive with the victims' mother, he denied that the victims ever witnessed this abuse, and he denied ever threatening the victims.

Once his relationship with the victims' mother ended, he did not move in with the family at the Foxhall Cove house. However, he confirmed that he still visited his biological daughter at this residence. When asked, the Defendant agreed that everyone else was "lying" about the sexual abuse and that he did not know their motive.

At the conclusion of the Defendant's proof, the State elected for count one, charging rape of a child against G.H., the time when G.H. was about eight or nine years old and the Defendant allegedly put his penis in her mouth for the first time in the laundry room at the Marlene Street house. As to count two, charging aggravated sexual battery against G.H., the State elected the time the Defendant allegedly caressed G.H.'s breasts over her clothes at the house on Marlene Street. For count three, charging rape of a child against C.T., the State elected the time at Kenilworth Apartments when C.T. was around six years old and the Defendant allegedly put his penis in her mouth. As to count four, charging sexual battery against C.T., the State elected the time when the Defendant allegedly touched C.T.'s breasts underneath her clothes in the laundry room at the Marlene Street house. For count five charging statutory rape by an authority figure against C.T., the State elected the time when C.T. was thirteen years old and the Defendant allegedly put his penis in her vagina while in C.T.'s bedroom at the Foxhall Cove house.

The jury found the Defendant guilty of two counts of rape of a child, two counts of aggravated sexual battery, and one count of the lesser included offense of sexual battery by an authority figure. The trial court sentenced the Defendant to a total effective sentence of seventy years at one hundred percent service in the Tennessee Department of Correction. The Defendant filed a motion for new trial, which the trial court denied.

This timely appeal followed.

## II.    ANALYSIS

The Defendant contends the evidence was insufficient to support his convictions. Relative to each of his convictions, he broadly challenges the convicting evidence based on the victims' testimony being unreliable, the lack of corroborating evidence, and the questionable circumstances in which the abuse came to light. To this point, while the Defendant concedes that a victim's testimony alone may support a conviction, he argues

that a rational juror could not have found him guilty beyond a reasonable doubt when the sexual abuse was reported during an argument, allegedly occurred on unspecified or vague dates years prior to the victims' reporting the abuse, no behavioral changes or concerns were noted in either victim prior to the disclosure, and law enforcement allowed the victims to be questioned together on the night of the disclosure. He further asserts that the evidence failed to show that he was an authority figure pursuant to Tennessee Code Annotated 39-13-527 for his conviction in count five. The State responds that the victims' testimony was sufficient to support the Defendant's convictions and that the evidence established that the Defendant was an authority figure pursuant to Code section -527 because he was in a position of trust within the victims' family.

The United States Constitution prohibits the states from depriving "any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. A state shall not deprive a criminal defendant of his liberty "except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). In determining whether a state has met this burden following a finding of guilt, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Because a guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt, the defendant has the burden on appeal of illustrating why the evidence is insufficient to support the jury's verdict. *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982). If a convicted defendant makes this showing, the finding of guilt shall be set aside. Tenn. R. App. P. 13(e).

"Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997). Appellate courts do not "reweigh or reevaluate the evidence." *Id*. (citing *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978)). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). Therefore, on appellate review, "the State is entitled to the strongest legitimate view of the trial evidence and all reasonable or legitimate inferences which may be drawn therefrom." *Cabbage*, 571 S.W.2d at 835.

Although the Defendant argues that the State failed to present any evidence to corroborate the victims' testimony, he acknowledges, and we agree, that a victim's testimony alone is sufficient to support a guilty verdict. *See State v. Bonds*, 189 S.W.3d 249, 256 (Tenn. Crim. App. 2005) ("It is well-settled law in Tennessee that 'the testimony

of a victim, by itself, is sufficient to support a conviction.'" (first quoting *State v. Strickland*, 885 S.W.2d 85, 87 (Tenn. Crim. App. 1993); and then citing *State v. Williams*, 623 S.W.2d 118, 120 (Tenn. Crim. App. 1981))). Here, the jury heard the victims testify to similar, consistent patterns of sexual abuse by the Defendant. Both victims recounted how the Defendant performed or made them perform similar sexual acts, how he waited until their mother was not at home to accomplish the abuse, how he carried out the abuse in certain private areas of the different residences, and how he sometimes used promises of candy to perpetuate the abuse. Both victims testified that the Defendant repeatedly forced them to perform oral sex on him, with C.T.'s specifically testifying that the Defendant put his penis in her mouth at the Kenilworth Apartments when she was six years old and G.H.'s testifying that the Defendant first put his penis in her mouth in the laundry room at the Marlene Street house when she was eight or nine years old. Both victims recalled specific instances wherein the Defendant touched their breasts while in the laundry room at the Marlene Street house, with G.H.'s testifying that the Defendant caressed her breasts over her clothes and C.T.'s testifying that the Defendant touched her breasts underneath her clothes. Additionally, C.T. testified that the Defendant put his penis into her vagina multiple times and recalled the specific incident that occurred in her bedroom at the Foxhall Cove house when she was thirteen years old.

While the Defendant denied such events occurred and asserted that the "unreliable" victims were lying, he essentially requests that we reweigh the credibility of the witnesses. Although the child victims might have been unable to provide exact dates, they were able to testify to the events with specificity as to their approximate ages and the locations of the abuse. In addition, the victims' approximate ages at the times of the abuse were confirmed by their mother's testimony, and the State was required to elect the particular offenses serving as the basis for the Defendant's convictions to preserve jury unanimity. And contrary to the Defendant's assertion that the victims did not exhibit any behavioral changes prior to their disclosures, the victims' mother testified that C.T. had recently started to have behavioral issues and that she was concerned that C.T. was possibly pregnant. Finally, the victims' accounts of certain incidents corroborated each other's accounts of the same incidents. The jury also heard the circumstances surrounding the victims' disclosure. Reweighing the evidence is beyond our purview, and the jury chose to credit the victims' version of events over the Defendant's, as was its province. *See Bland*, 958 S.W.2d at 659.

When viewed in the light most favorable to the State, any inaccuracies or inconsistencies in the victims' testimony were not so improbable as to create a reasonable doubt of Defendant's guilt. Accordingly, the Defendant's position that the victims' testimony alone provided an insufficient basis to support the jury's verdict of guilty is

unavailing, and the evidence sufficiently supports the Defendant's commission of these acts of sexual abuse. *See State v. Elkins*, 102 S.W.3d 578, 582-83 (Tenn. 2003) (holding that a child rape victim's testimony was sufficient to support the defendant's conviction, despite some inconsistencies in that victim's testimony); *State v. Maxwell*, No. M2024-00786-CCA-R3-CD, 2026 WL 592500, at *6-7 (Tenn. Crim. App. Mar. 3, 2026) (rejecting a similar sufficiency challenge to a child rape conviction, wherein the defendant argued that "the victim's testimony and statements to others were inconsistent and not corroborated by forensic evidence"), *no perm. app. filed*.

Regarding the Defendant's conviction for sexual battery by an authority figure, he also argues that the proof failed to establish he was an authority figure. Pursuant to the statute, for a defendant to be considered an authority figure as charged to the jury in this case, the defendant, at the time of the offense, must have been "in a position of trust . . . and used the position of trust . . . to accomplish the sexual contact[.]" Tenn. Code Ann. § 39-13-527(a)(3)(A).

In *State v. McGrowder*, this court noted that our criminal code does not define "position of trust" as used in the sexual battery by an authority figure statute, but we utilized jurisprudence from our supreme court regarding the sentencing enhancement factor of abuse of a position of public or private trust to supply a definition. No. M2013-01184-CCA-R3-CD, 2014 WL 4723100, at *9-10 (Tenn. Crim. App. Sep. 23, 2014); *see also* Tenn. Code Ann. § 40-35-114(14) (2010). Turning to that jurisprudence, our supreme court, in examining whether the defendant had abused a position of public or private trust for purposes of sentencing enhancement, explained that a "court must look to 'the nature of the relationship,' and whether that relationship 'promoted confidence, reliability, or faith.' . . . A relationship which promotes confidence, reliability, or faith, usually includes a degree of vulnerability." *State v. Gutierrez*, 5 S.W.3d 641, 646 (Tenn. 1999) (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). Notably, "[t]he position of parent, step-parent, babysitter, teacher, [and] coach are but a few obvious examples. The determination of the existence of a position of trust does not depend on the length or formality of the relationship, but upon the nature of the relationship." *Kissinger*, 922 S.W.2d at 488.

Here, the evidence taken in the light most favorable to the State shows that the Defendant was an authority figure pursuant to Code section 39-13-527 because he was in a position of trust within the victims' family and he used this position of trust to sexually abuse C.T. at the Foxhall Cove house. The Defendant, by his own admission, took on the role of a stepfather to the victims when C.T. was approximately six years old and G.H. was approximately three years old. Throughout his relationship with the victims' mother,

which spanned a significant portion of the victims' lives, the Defendant considered the victims to be his daughters and was entrusted by their mother to watch the victims, discipline them, and "keep them safe[.]" Even after the Defendant's romantic relationship with the victims' mother ended and he no longer lived with the victims' family, he was still "a presence" in the victims' lives because he was their youngest sister's biological father, and as such, he was allowed to visit the Foxhall Cove house when no other adult was present. Accordingly, the nature of his relationship with the victims continued to "promote[] confidence, reliability, or faith" and included a degree of vulnerability. *See Gutierrez*, 5 S.W.3d at 646. The Defendant then used this position of trust to visit the Foxhall Cove house when C.T. was thirteen years old and no other adult was present, enter her bedroom, and engage in unlawful sexual contact with her. *See State v. Capps*, No. E2023-01419-CCA-R3-CD, 2024 WL 5135477, at *8 (Tenn. Crim. App. Dec. 17, 2024) (concluding that the defendant was in a position of trust with the victim and used the position of trust to accomplish sexual contact when the defendant was in a safeguarding relationship with the victim and was left unsupervised with the victim because of a familial bond), *perm. app. denied* (Tenn. May 23, 2025); *see also State v. Ciaramitaro*, No. W2021-00046-CCA-R3-CD, 2022 WL 1460242, at *11 (Tenn. Crim. App. May 9, 2022) (affirming, in the sentencing enhancement context, a finding that the defendant abused a private trust when he had been entrusted with the victims' care on account of his close relationship with their family). The Defendant is not entitled to relief.

### III.   CONCLUSION

Based on the foregoing authorities and reasoning, we affirm the judgments of the trial court.

 s/ Kyle A. Hixson_____
KYLE A. HIXSON, JUDGE
